247 P.3d 470 (2011)
STATE of Washington, Respondent,
v.
Steven Lavelle LEE and Tsegazeab A. Zerahaimanot, Appellants.
Nos. 62864-0-I, 62961-1-I.
Court of Appeals of Washington, Division 1.
February 7, 2011.
*472 Oliver Ross Davis, Washington Appellate Project, Seattle, WA, for Appellant Steven Lavelle Lee.
Steven Witchley, Ellis Holmes & Witchley PLLC, Seattle, WA, for Appellant Tsegazeab A. Zerahaimanot.
Mary Kathleen Webber, Snohomish County Prosecutor's Office, Everett, WA, for Respondent.

PUBLISHED IN PART
COX, J.
¶ 1 Steven Lee and Tsegazeab Zerahaimanot, co-defendants in a joint trial, appeal their judgments and sentences in this prosecution for one count of felony murder, one count of first degree murder, and one count of second degree unlawful possession of a firearm. Both murder counts included firearm allegations to support enhancements.
¶ 2 The first issue is whether the trial court violated their state and federal rights *473 to a public trial by sealing juror questionnaires without first conducting the analysis required under State v. Bone-Club.[1] The public's right to open access to court proceedings is also implicated. The second issue is whether their confrontation rights were violated when the trial court admitted cell phone records without providing an opportunity to cross-examine the record custodians.
¶ 3 Lee and Zerahaimanot make additional claims that we address in the unpublished portion of this opinion.
¶ 4 We remand to the trial court for reconsideration of its order to seal the juror questionnaires under Bone-Club. We also direct the trial court to vacate Lee's and Zerahaimanot's premeditated murder convictions on double jeopardy grounds, leaving undisturbed their felony murder convictions. In all other respects, we affirm.
¶ 5 In the early morning of August 21, 2007, Jill Rich and Bristol Chaney found Forrest Starrett lying next to his truck in Everett, Washington. Starrett had suffered gunshot wounds to the leg and head. He was dead when police arrived at the scene. Investigation led to Lee and Zerahaimanot.
¶ 6 The State charged them in Snohomish County Superior Court with felony murder, premeditated murder, and another crime not relevant to this appeal. The charges also included firearm allegations to support requests for enhancements.
¶ 7 The night of the shooting, Starrett was at Michelle Walker's apartment with several other individuals, including Leroy Holt. Holt invited Lee and Zerahaimanot to the apartment. Holt later witnessed Zerahaimanot shoot Starrett in the lower part of his body and Lee shoot Starrett in the head. It was the State's theory that Lee and Zerahaimanot killed Starrett because they were suspicious that he was a police officer. A jury convicted them as charged.
¶ 8 Lee and Zerahaimanot appeal.

OPEN AND PUBLIC TRIAL
¶ 9 Lee and Zerahaimanot argue that their federal and state constitutional rights to a public trial were violated when the trial court sealed juror questionnaires without first conducting a Bone-Club hearing on the record. We hold that their right to a public trial was not violated. But, the failure to conduct a Bone-Club hearing before entering the sealing order is inconsistent with the public's right of open access to court records. Accordingly, remand for reconsideration of the sealing order at such a hearing is required.
¶ 10 An accused's right to a public trial is protected by both the state and federal constitutions. The Sixth Amendment provides, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."[2] In article I, section 22, the Washington Constitution provides "[i]n criminal prosecutions the accused shall have the right . . . to have a speedy public trial by an impartial jury."[3]
¶ 11 Separate from the defendant's right to a public trial, the public has a right to open court proceedings. Article I, section 10, of the Washington Constitution provides that "[j]ustice in all cases shall be administered openly."[4] This provision has been interpreted as protecting the public and press's right to open and accessible court proceedings, similar to the public's right under the First Amendment.[5]
These [respective constitutional] provisions "assure a fair trial, foster public understanding and trust in the judicial system and give judges the check of public scrutiny." The guaranty of open criminal proceedings extends to jury selection, which is important "`not simply to the adversaries but to the criminal justice system.'"[[6]]
*474 ¶ 12 While the public's right to open court proceedings and the defendant's right to a public trial are independent, they "serve complementary and interdependent functions in assuring fairness of our judicial system. . . ."[7] In Bone-Club, the supreme court set out the standards for closing all or any portion of a criminal trial.[8] Because the defendant's rights under article I, section 22 and the public's right under article I, section 10 are interrelated, the same analysis applies to both rights:
1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a `serious and imminent threat' to that right.
2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
4. The court must weigh the competing interests of the proponent of closure and the public.
5. The order must be no broader in its application or duration than necessary to serve its purpose."[[9]]
In State v. Waldon,[10] this court held the same analysis applies when sealing court documents.[11]
¶ 13 When the defendants' right to a public trial is violated, the court devises a remedy appropriate to that violation.[12] If the error is structural in nature, the conviction must be reversed and a new trial is required.[13] An error is structural when it "`necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'"[14] But, in each case the "remedy must be appropriate to the violation."[15]
¶ 14 Whether the defendant's right to a public trial or the public's right to open court proceedings was violated are questions of law subject to de novo review.[16]
¶ 15 Here, Lee and Zerahaimanot argue that sealing the juror questionnaires without a Bone-Club analysis violated their public trial right under article I, section 22. They also argue that article I, section 10 is implicated.[17]
¶ 16 This court addressed whether sealing juror questionnaires violated these constitutional provisions in State v. Coleman.[18] There, the State prosecuted Coleman for rape and multiple counts of first degree child molestation.[19] The members of the venire completed questionnaires that included matters concerning their sexual histories.[20] The completed questionnaires were provided to counsel and jury selection proceeded in open court.[21]
*475 ¶ 17 Three days after the jury was accepted as constituted and sworn, the court ordered the questionnaires sealed, stating in its order:
The court finds compelling circumstances for sealing the documents indicated below:
Jury questionnaires containing personal sexual history of prospective jurors related to issues in this case. The individual juror's right to privacy in this information greatly outweighs the public's right to access the court files.[[22]]
The court did not hold a Bone-Club hearing to consider whether sealing was proper and appears to have ordered sealing on its own motion.[23] The jury convicted Coleman of two counts of molestation, acquitted him of a third, and failed to reach a verdict on the rape charge.[24]
¶ 18 On appeal, Coleman argued that the trial court's failure to undertake a Bone-Club analysis before entering its sealing order violated both "his right and that of the public to an open and public trial."[25] He further claimed that these violations constituted structural error, requiring a new trial.
¶ 19 This court concluded that the failure to conduct a Bone-Club analysis prior to sealing the juror questionnaires did not violate Coleman's right to a public trial under article 1, section 22.[26] Rather, it violated the public's right to open and accessible court proceedings under article I, section 10:
"Under these authorities, the court should have conducted a Bone-Club analysis before sealing the questionnaires. Violation of the public's right to open court records requires remand for reconsideration of the order.

Coleman contends that sealing the questionnaires without conducting the Bone-Club analysis amounted to structural error, from which prejudice is presumed and for which a new trial is warranted. On these facts, we do not agree that structural error occurred. [First, t]he questionnaires were used only for selection of the jury, which proceeded in open court. [Second, t]he questionnaires were not sealed until several days after the jury was seated and sworn. [Third, u]nlike answers given verbally in closed courtrooms, there is nothing to indicate that the questionnaires were not available for public inspection during the jury selection process. Thus, the subsequent sealing order had no effect on Coleman's public trial right and did not "create `defect[s] affecting the framework within which the trial proceeds.'"

The error was not structural."[[27]]
¶ 20 This case is factually similar to Coleman. Here, Zerahaimanot's counsel proposed use of the questionnaires prior to trial, and neither Lee nor the State objected. The juror questionnaires identified the defendants and some witnesses as African-Americans and asked the members of the venire about their attitudes toward African-Americans. The questionnaires also asked the members of the venire about their attitudes about firearms. The court sealed the answers to these questionnaires after jury selection.
¶ 21 Lee and Zerahaimanot do not assert that jury selection was closed to the public. More importantly, they fail to show that the completed questionnaires were used for anything other than jury selection. Thus, there is no factual distinction from the first factor of Coleman.
¶ 22 Lee and Zerahaimanot also fail to distinguish this case from Coleman on the second factor. There, the trial court entered the sealing order after the parties accepted the jury, as constituted. Here, the same is true. On November 18, 2008, Lee and Zerahaimanot accepted the jury, as constituted. The following day, the jury was seated and sworn and the court, sua sponte, entered an order sealing the questionnaires.
*476 ¶ 23 Lee and Zerahaimanot claim that the juror questionnaires in this case were sealed contemporaneously with the swearing of the jury, contrary to the facts in Coleman. But this factual distinction, if true, is not material. This record shows that the questionnaires were only used in open court during jury selection, not after. It is irrelevant that the sealing of the questionnaires may have been done contemporaneously with the swearing of the jury following its selection and acceptance by the parties in open court.
¶ 24 Lee and Zerahaimanot attempt to distinguish Coleman primarily on the third factor: whether the questionnaires were available to the public during voir dire. They rely on the following colloquy:
"THE COURT: We're going to be in court at nine o'clock in the morning [tomorrow]. . . . I'm going to have [the jury] fill out the questionnaireafter they have been sworn inI'm going to have them fill out the questionnaire. After they are done filling out the questionnaire they can leave. Once we have all the questionnaires assembled, my law clerk will copy them and she will get you copies of the questionnaires so you can start reading them.
I don't anticipate doing anything with the jury tomorrow other than introducing them to the case, giving them some preliminary instruction, having them fill out the questionnaire and then go home.
[ZERAHAIMANOT'S COUNSEL]: Two question [sic] I have: Am I correct in assuming that the questionnaires cannot leave the courtroom? Can we take them?
THE COURT: Let me think about that.
[ZERAHAIMANOT'S COUNSEL]: Certainly keep them confidential.
THE COURT: Let me think about that. Certainly if I do allow you to take them from the courtroom, nobody is going to be allowed to take copies or anything like that, and I'm going to want them back.
[ZERAHAIMANOT'S COUNSEL]: Right."[[28]]
¶ 25 Read in context, this exchange shows that Lee and Zerahaimanot had full access to the questionnaires prior to the sealing order. The issue is whether this exchange evidences either an express or de facto sealing, contrary to the public's right to obtain access to court documents. Also, at issue is whether the claimed error is "structural," requiring a new trial.[29]
¶ 26 It is unclear from this record whether the court's comments represented a decision to deny public access to the completed questionnaires during voir dire. What the exchange does show is that the court expressed concern about sending copies of the questionnaires out of the courtroom with the attorneys. The court's remark that "nobody is going to be allowed to take copies or anything like that, and I'm going to want them back" reflects this concern.
¶ 27 No one discussed the public's access to the questionnaires. We do not suggest that the failure to raise the issue constituted a waiver of the claim on appeal. Likewise, it did not diminish the trial court's responsibility to protect the constitutional safeguards that are before us. Nevertheless, on this limited record, we will not speculate about how the court would have ruled had a member of the public asked for access to these questionnaires. In sum, this colloquy between court and counsel tells us little, if anything, about whether the questionnaires were unavailable to the public.
¶ 28 We also note that the record is silent on where these questionnaires were located during jury selection, which unquestionably proceeded in open court. This fact would be *477 important in determining whether the public had access to them. Yet, Lee and Zerahaimanot fail to point to anything in this record, either in the above exchange or elsewhere, to fill this void. And, even assuming the questionnaires were not filed in the superior court clerk's office, or otherwise easily accessible to the public, that is not necessarily equivalent to a complete denial of public access.
¶ 29 In short, on this record, Lee and Zerahaimanot fail in their burden to show that the questionnaires were unavailable for public inspection during jury selection. This is fatal to their claim that the court violated their public trial right. As in Coleman, the trial court's failure to conduct a Bone-Club analysis prior to entering the sealing order did not violate Lee's and Zerahaimanot's article 1, section 22 right to a public trial. Their attempts to distinguish that case are unpersuasive.
¶ 30 Lee and Zerahaimanot next argue that Coleman appears to suggestwithout explicitly statingthat the violation in that case was de minimus, not structural.[30] We do not read that case to make any such suggestion and the supreme court recently rejected such a characterization.[31] Nothing in Coleman departs from that guidance.
¶ 31 They next argue that Coleman was overruled sub silentio by State v. Strode[32] and State v. Momah.[33] We disagree.
¶ 32 In those cases, the supreme court decided that the trial courts either expressly or implicitly closed the courtrooms by conducting a portion of voir dire in chambers.[34] A plurality concluded in Strode that "full courtroom closure during jury selection" must be preceded by the "Bone-Club analysis; failure to do so results in violation of the defendant's public trial rights."[35] Addressing the appropriate remedy, the court held that "denial of the public trial right is deemed to be a structural error and prejudice is presumed."[36] "[T]herefore, Strode's convictions are reversed and the case is remanded for a new trial."[37] Two justices, writing separately, concurred in that result.
¶ 33 Likewise, in Momah, the supreme court held that a trial court must undertake the Bone-Club analysis prior to a de facto closing of the courtroom during voir dire.[38] But in Momah, the court concluded that there was no structural error because the trial court weighed the appropriate factors on the record prior to closing the courtroom, effectively engaging in a Bone-Club analysis.[39]
¶ 34 In our view, neither Strode, a plurality decision, nor Momah overrules Coleman.[40] First, neither case addresses the issue of whether sealing juror questionnaires without first conducting a Bone-Club analysis violates a defendant's right to a public trial under article 1, section 22 or the Sixth Amendment. Rather, both deal with the factually distinguishable issue of closing the courtroom for voir dire without conducting a Bone-Club analysis.
¶ 35 Second, neither case addresses the appropriate remedy where a court errs by failing to conduct the Bone-Club analysis prior to sealing juror questionnaires. Thus, the remedy for an article 1, section 10 violation was not at issue there, as it was in Coleman.
*478 ¶ 36 Finally, Strode and Momah recognize that a defendant should not receive a new trial where his right to a public trial has been safeguarded,[41] or where this would be a "windfall" remedy.[42] This is consistent with Coleman's holding that there is no easy distinction between juror questionnaires as part of open court proceedings and juror questionnaires as court records. This court concluded that Coleman did not demonstrate that sealing juror questionnaires after jury selection was complete rendered his trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence. In short, there was no structural error.
¶ 37 We conclude that the holding in Coleman is not inconsistent with either Momah or Strode. As such, Lee and Zerahaimanot have failed to show any violation of their public trial right under article 1, section 22 or the Sixth Amendment.
¶ 38 After Coleman, there can be no serious dispute that the trial court in this case violated the public's right of open access to court records by failing to conduct a Bone-Club hearing before entering its sealing order. The question is what remedy is appropriate for this error. We follow Coleman and remand to the trial court to conduct a Bone-Club hearing and to reconsider its closing order. Lee and Zerahaimanot have not presented to us any reasoned argument, other than the points we have already discussed, why the error here is structural, requiring a new trial.
¶ 39 Remand for reconsideration of the sealing order is also consistent with relevant case law other than Coleman.
¶ 40 In Seattle Times Co. v. Ishikawa,[43] the supreme court held that the trial court erred in sealing the record from a hearing without first analyzing the five factors outlined by the court.[44] These factors are the immediate predecessor of the Bone-Club analysis.[45] The trial court also erred in failing to address these factors prior to denying two regional newspapers' motions to unseal the records from the hearing.[46] The supreme court remanded the matter to the trial court to reconsider the newspapers' motions to unseal the records in accordance with the articulated standard.[47] No more severe remedy was imposed in that case. While Ishikawa was a civil case, it nonetheless provides guidance that is helpful here.
¶ 41 In Waldon, the trial court granted the defendant's motion to seal her court record based on General Rule (GR) 15 rather than the five part constitutional test in Ishikawa.[48] This court reversed, concluding that GR 15 must be read in harmony with Ishikawa.[49] Because the trial court applied the incorrect legal standard in sealing the court record, the correct remedy was to remand for the trial court to reconsider the motion to seal under both GR 15 and Ishikawa.[50]
¶ 42 Finally, in Waller v. Georgia.[51] after concluding that the trial court erred in closing a pretrial suppression hearing to the public, the U.S. Supreme Court remanded for a new suppression hearing.[52] The court concluded that a new trial was required only if the new hearing resulted in suppression of material evidence not suppressed at the first, closed hearing.[53] It reasoned that if "essentially the same evidence is suppressed, a new *479 trial presumably would be a windfall for the defendant, and not in the public interest."[54]
¶ 43 In sum, on this record, Lee and Zerahaimanot's right to a public trial was not violated. But, the trial court did err by sealing the juror questionnaires without first conducting a Bone-Club analysis. That error was not structural. Thus, the appropriate remedy is to remand this case for reconsideration of the sealing order under Bone-Club and other relevant authority.

TESTIMONIAL AUTHENTICATION OF BUSINESS RECORDS
¶ 44 Lee and Zerahaimanot next argue that the admission of cell phone records through affidavits that attest to the authenticity of those records violated their Sixth Amendment right to confrontation. We disagree.
¶ 45 "The appellate court may refuse to review any claim of error which was not raised in the trial court."[55] But, manifest error affecting a constitutional right may be reviewed for the first time on appeal.[56] In State v. Lynn,[57] this court outlined a four-step analysis for constitutional errors raised for the first time on appeal:
First, the reviewing court must make a cursory determination as to whether the alleged error in fact suggests a constitutional issue. Second, the court must determine whether the alleged error is manifest. Essential to this determination is a plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case. Third, if the court finds the alleged error to be manifest, then the court must address the merits of the constitutional issue. Finally, if the court determines that an error of constitutional import was committed, then, and only then, the court undertakes a harmless error analysis.[[58]]
¶ 46 Here, the court admitted several cell phone records under RCW 10.96.030. This statute allows business records to be authenticated by affidavits from the custodians of the records rather than requiring the custodians to testify in court.[59] Lee and Zerahaimanot did not object to the admission of the records within the time frame required by RCW 10.96.030.[60] Instead, they raise this issue for the first time on appeal.
¶ 47 The Sixth Amendment Confrontation Clause states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ."[61] The Fourteenth Amendment makes the right binding on the states.[62] Based upon a cursory review of this issue, as required by the first factor in Lynn, the custodians' failure to testify implicates the Confrontation Clause and therefore suggests a constitutional issue.
¶ 48 Lee and Zerahaimanot assert that the error was manifest because the cell phone records at issue corroborated the testimony of Holt, the only eye-witness to the crime. They contend that Holt's credibility was otherwise "shaky" because he fled the scene of the shooting, eluded police, testified under a plea agreement with the State, and was a drug dealer. Given the impact Holt's credibility could have had on the jury's decision, the alleged error was manifest under the second factor in Lynn.
*480 ¶ 49 We now address the constitutional issue: whether the admission of affidavits authenticating business records under RCW 10.96.030 violates the Confrontation Clause.
¶ 50 "The admission of hearsay frequently raises concerns under the Confrontation Clause."[63] Even though hearsay evidence may be admissible under a statutory or common law exception, the Confrontation Clause also requires analysis.[64] In Washington, the admission of business records is generally an exception to the hearsay rules.[65] But, the admission of "testimonial" hearsay evidence violates the Confrontation Clause unless the proponent shows that the declarant is unavailable and that the accused had a prior opportunity to cross-examine the declarant.[66] If evidence is not "testimonial," then no such showing is required.[67]
¶ 51 A violation of the Confrontation Clause is reviewed de novo.[68]
¶ 52 In Melendez-Diaz v. Massachusetts,[69] the U.S. Supreme Court recently considered whether an affidavit was "testimonial" under the Confrontation Clause. There, the defendant was charged with distributing and trafficking cocaine.[70] The trial court admitted three "certificates of analysis," sworn to by laboratory analysts before a notary public, which stated that the seized bags were "examined with the following results: The substance was found to contain: Cocaine,"[71] The trial court did not require the analysts who prepared the certificates to testify in court.[72] The Court held that the admission of the certificates violated the defendant's confrontation rights because they were created for the sole purpose of providing evidence against the defendant.[73]
¶ 53 Significantly, the court also articulated that not everyone providing evidence for trial must testify in court:
Contrary to the dissent's suggestion, we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case.[[74]]
For example, it explained that affidavits of authenticity are not "testimonial:"
The dissent identifies a single class of evidence which, though prepared for use at trial, was traditionally admissible: a clerk's certificate authenticating an official recordor a copy thereoffor use as evidence. But a clerk's authority in that regard was narrowly circumscribed. He was permitted "to certify to the correctness of a copy of the record kept in his office," but had "no authority to furnish, as evidence for the trial of a lawsuit, his interpretation of what the record contains or shows, or to certify to its substance or effect."[[75]]
Therefore, under Melendez-Diaz, a custodian may authenticate a business record by affidavit but cannot, without the opportunity for confrontation, create a record for the sole *481 purpose of providing evidence against the defendant.[76]
¶ 54 This court recently applied Melendez-Diaz in State v. Jasper.[77] There, the trial court admitted affidavits that the defendant was driving with a suspended license based upon a diligent search of the public records.[78] This court held that the affidavits were testimonial under Melendez-Diaz because they included "factual assertions, intended to prove an element of a crime charged. They are not merely statements of the authenticity of the attached records themselves."[79]Jasper acknowledges the clear exception for affidavits proving only the authenticity of a record:
The affidavit is not merely a certification that the agency records attached to the affidavit were true and correct copies of records processed by the DOL. Without question, such a statement would be of the type approved by Melendez-Diaz.[80]
¶ 55 This case falls squarely within the exception for authentication described in Melendez-Diaz and Jasper. Here, there is no dispute that the cell phone records were business records created for the phone companies' administration. They were not created as evidence against Lee and Zerahaimanot. Neither of them contends otherwise.
¶ 56 In accordance with RCW 10.96.030, the cell phone records were properly authenticated by affidavits from the record custodians. RCW 10.96.030(2) requires that "to be admissible without testimony from the custodian of records, business records must be accompanied by an affidavit, declaration, or certification by its record custodian or other qualified person. . . ."The affidavit must include:
contact information for the witness completing the document and attest[ation] to the following:
(a) The witness is the custodian of the record or sets forth evidence that the witness is qualified to testify about the record;
(b) The record was made at or near the time of the act, condition, or event set forth in the record by, or from information transmitted by, a person with knowledge of those matters;
(c) The record was made in the regular course of business;
(d) The identity of the record and the mode of its preparation; and
(e) Either that the record is the original or that it is a duplicate that accurately reproduces the original.[[81]]
None of this information "create[s] a record for the sole purpose of providing evidence against a defendant" as in Melendez-Diaz.[82] Additionally, the affidavits admitted in this case did not include information other than that required by the statute.
¶ 57 Based upon the reasoning in Melendez-Diaz. these affidavits are not "testimonial." They were created and admitted solely to prove the authenticity of the underlying phone records. Thus, the affidavits do not violate the confrontation rights of Lee or Zerahaimanot. Accordingly, we reject their constitutional claims and need not reach the harmless error analysis under Lynn.
¶ 58 Lee and Zerahaimanot argue that because RCW 10.96.030 allows affidavits to authenticate the underlying document, the affidavits are created specifically for use at trial and thus violate Melendez-Diaz. But, the Supreme Court specifically rejected that argument when it explained that a clerk's certificate authenticating an official record "though prepared for use at trial[,]" is permissible.[83] Accordingly, we reject this claim.
¶ 59 We remand to the trial court for reconsideration of its order to seal the juror questionnaires under Bone-Club. We also *482 direct the trial court to vacate Lee and Zerahaimanot's premeditated murder convictions on double jeopardy grounds, leaving undisturbed their felony murder convictions. In all other respects, we affirm.
¶ 60 The balance of this opinion has no precedential value. Accordingly, under RCW 2.06.040, it shall not be published.
WE CONCUR: LEACH, A.C.J., and ELLINGTON, J.
NOTES
[1] 128 Wash.2d 254, 906 P.2d 325 (1995).
[2] U.S. CONST. amend. VI.
[3] WASH. CONST. art. 1, § 22.
[4] WASH. CONST. art. 1, § 10.
[5] State v. Easterling, 157 Wash.2d 167, 174, 178, 137 P.3d 825 (2006) (citing Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 505, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)).
[6] State v. Coleman, 151 Wash.App. 614, 620, 214 P.3d 158 (2009) (quoting State v. Duckett, 141 Wash.App. 797, 803, 173 P.3d 948 (2007); In re Pers. Restraint of Orange, 152 Wash.2d 795, 804, 100 P.3d 291 (2004) (quoting Press-Enterprise, 464 U.S. at 505, 104 S.Ct. 819)).
[7] State v. Momah, 167 Wash.2d 140, 148, 217 P.3d 321 (2009), cert. denied, ___ U.S. ___, 131 S.Ct. 160, 178 L.Ed.2d 40 (2010).
[8] Bone-Club, 128 Wash.2d at 258-59, 906 P.2d 325.
[9] Id. (quoting Allied Daily Newspapers v. Eikenberry, 121 Wash.2d 205, 210-11, 848 P.2d 1258 (1993)); see also Seattle Times Co. v. Ishikawa, 97 Wash.2d 30, 36-39, 640 P.2d 716 (1982).
[10] 148 Wash.App. 952, 967, 202 P.3d 325, review denied, 166 Wash.2d 1026, 217 P.3d 338 (2009).
[11] Id. at 967, 202 P.3d 325.
[12] Momah, 167 Wash.2d at 149, 217 P.3d 321.
[13] Id.
[14] Id. (quoting Washington v. Recuenco, 548 U.S. 212, 218-19, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006)).
[15] Id. at 150, 155-56, 217 P.3d 321.
[16] Id. at 147, 217 P.3d 321.
[17] Brief of Appellant Zerahaimanot at 20-21.
[18] 151 Wash.App. 614, 621, 214 P.3d 158 (2009).
[19] Id. at 617, 214 P.3d 158.
[20] Id. at 618, 214 P.3d 158.
[21] Id.
[22] Id.
[23] Id. at 618-19, 214 P.3d 158.
[24] Id. at 618, 214 P.3d 158.
[25] Id. at 619, 214 P.3d 158.
[26] Id. at 623-24, 214 P.3d 158.
[27] Id. (internal citations omitted) (emphasis added).
[28] Report of Proceedings (Nov. 13, 2008) at 4-5.
[29] The U.S. Supreme Court has identified a limited list of trial errors in criminal cases as "structural" and not subject to harmless error analysis. See Arizona v. Fulminante, 499 U.S. 279, 309-10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). "Structural" errors include the total deprivation of the right to counsel at trial (Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)); an impartial trail court judge (Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927)); unlawful exclusion of members of the defendant's race from a grand jury (Vasquez v. Hillery, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986)); the right to self-representation at trial (McKaskle v. Wiggins, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984)); and the right to a public trial (Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984)).
[30] Brief of Appellant Zerahaimanot at 33.
[31] State v. Strode, 167 Wash.2d 222, 230, 217 P.3d 310 (2009).
[32] 167 Wash.2d 222, 217 P.3d 310 (2009).
[33] 167 Wash.2d 140, 217 P.3d 321 (2009).
[34] Strode, 167 Wash.2d at 223, 217 P.3d 310; Momah, 167 Wash.2d at 145-46, 217 P.3d 321.
[35] Strode, 167 Wash.2d at 228, 217 P.3d 310.
[36] Id. at 231, 217 P.3d 310.
[37] Id.
[38] Momah, 167 Wash.2d at 149-50, 217 P.3d 321.
[39] Id. at 155-56, 217 P.3d 321.
[40] Coleman was decided on August 17, 2009, just under two months prior to Strode and Momah, which were decided on October 8, 2009. Coleman was not the subject of a petition for review. But In re Detention of Townsend, noted at 157 Wash.App. 1039, 2010 WL 3221940, which follows Coleman, is the subject of a currently pending petition for review.
[41] Id. at 236, 217 P.3d 310 (Fairhurst, J. and Madsen, J., concurring).
[42] Momah, 167 Wash.2d at 150, 217 P.3d 321.
[43] 97 Wash.2d 30, 640 P.2d 716 (1982).
[44] Id. at 42-46, 640 P.2d 716.
[45] See Bone-Club, 128 Wash.2d at 258-59, 906 P.2d 325.
[46] Ishikawa, 97 Wash.2d at 42-46, 640 P.2d 716.
[47] Id. at 45-46, 640 P.2d 716.
[48] Waldon, 148 Wash.App. at 955-56, 202 P.3d 325.
[49] Id. at 966, 202 P.3d 325.
[50] Id. at 957, 967, 202 P.3d 325.
[51] 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984).
[52] Id. at 48-49, 104 S.Ct. 2210.
[53] Id.
[54] Id. at 50, 104 S.Ct. 2210.
[55] RAP 2.5(a).
[56] RAP 2.5(a)(3).
[57] 67 Wash.App. 339, 345, 835 P.2d 251 (1992).
[58] Id.
[59] RCW 10.96.030.
[60] RCW 10.96.030: "(3) . . . A motion opposing admission in evidence of the record shall be made and determined by the court before trial and with sufficient time to allow the party offering the record time, if the motion is granted, to produce the custodian of the record or other qualified person at trial, without creating hardship on the party or on the custodian or other qualified person . . . (4) Failure by a party to timely file a motion . . . shall constitute a waiver of objection to admission of the evidence. . . ."
[61] U.S. CONST. amend. VI.
[62] Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).
[63] State v. Kronich, 160 Wash.2d 893, 901, 161 P.3d 982 (2007) (citing State v. Monson, 113 Wash.2d 833, 840, 784 P.2d 485 (1989)).
[64] Id. (citing Crawford v. Washington, 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)).
[65] ER 803(6); RCW 5.45.010, .020.
[66] Kronich, 160 Wash.2d at 902, 161 P.3d 982 (citing Crawford, 541 U.S. at 53-54, 68, 124 S.Ct. 1354).
[67] Id. (citing Crawford, 541 U.S. at 53-54, 68, 124 S.Ct. 1354).
[68] Id. at 901, 124 S.Ct. 1354 (citing Lilly v. Virginia, 527 U.S. 116, 137, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999)).
[69] ___ U.S. ___, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009).
[70] Id. at 2530.
[71] Id. at 2531.
[72] Id.
[73] Id. at 2539-40.
[74] Id. at 2532 n. 1 (emphasis added).
[75] Id. at 2538-39 (quoting State v. Wilson, 141 La. 404, 409, 75 So. 95 (1917) (internal citations omitted)).
[76] Id. at 2539.
[77] State v. Jasper, 158 Wash.App. 518, 245 P.3d 228 (2010).
[78] Id. at 181.
[79] Id.
[80] Id.
[81] RCW 10.96.030(2).
[82] Melendez-Diaz, 129 S.Ct. at 2539.
[83] Id. at 2538.