# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | DIVISION ONE |
| Respondent, | ) | |
| | ) | No. 72934-9-I |
| v. | ) | |
| | ) | |
| WILLIAM RICHARD RODGERS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: August 1, 2016 |
| | ) | |

DWYER, J. — William Rodgers was charged and convicted of the premeditated murder of his wife. On appeal, he contends that several witnesses, including two of his children, his close friend, and his mistress, were permitted to give improper opinion testimony as to his guilt. He also asserts that his attorney was ineffective for failing to object to certain of this testimony. In a statement of additional grounds, Rodgers also contends that his Sixth Amendment right to confrontation was violated because the trial court authenticated certain evidence against him based on a business records certification letter, and that his counsel was ineffective for failing to seek jury instructions on lesser or inferior-degree offenses. Finding no error, we affirm.

I

William Rodgers was married to Sheri Rodgers. Together, they had three children, Nicholas, Natasha, and Jeremiah.[1]

In 2011, Rodgers began having an affair with a coworker named Meighan Nichols. Rodgers asked his friend, Mark Thompson, to obtain a second telephone for him so that he could keep in contact with Nichols without Sheri finding out. Thompson reluctantly agreed. Rodgers told some friends that he was going through marital difficulties but intended to repair his marriage with Sheri.

Rodgers' relationship with his children and Sheri became strained when they learned about the affair. Friends described Rodgers as distracted and withdrawn during this time. Rodgers' friendships suffered as a result. Friends, family, and coworkers noticed that Sheri began losing weight and had thinning hair. Rodgers and Sheri began sleeping in separate bedrooms.

Around this same time, William West met Rodgers and Sheri online. The three of them met twice for sexual intercourse. West found Rodgers "intense" and decided not to meet the two of them anymore. Encouraged by Rodgers, Sheri and West continued a physical relationship and maintained contact via e-mail and text messages.

In the fall of 2011, Rodgers went to his family physician, Dr. Roger Estep, in "emotional turmoil." Rodgers reported having nightmares, difficulty sleeping, depression, and anxiety. Rodgers explained to Estep that he had suffered

---

[1] Except William, the members of the Rodgers family are referred to by their first names to avoid confusion.

sexual abuse from his father as a child and had been traumatized by his military service. Estep diagnosed Rodgers with posttraumatic stress disorder (PTSD). Estep prescribed Rodgers a sleep aid and anxiety and nightmare reducing medication.

Beginning in October 2011, Rodgers also began visiting mental health counselor Leanne Haywood. Haywood diagnosed Rodgers with PTSD and depression. Rodgers told Haywood that he was cutting himself as a way to relieve his emotional pain.

On May 27, 2012, Rodgers and Sheri went to Nate and Jonna Dunham's house for dinner. Nothing unusual happened during the dinner. Nate Dunham opined that Rodgers and Sheri "were happy." Rodgers had plans the following day to pick up a barbeque with his friend, Tim Livingston. Sheri had plans to meet a friend at 9:00 a.m. for coffee.

But the coffee date never happened. Instead, on the morning of May 28, 2012, Rodgers called Livingston "very frantic," and said that Sheri had fallen and was unresponsive. Livingston went to Rodgers' house and found Rodgers "distraught, frankly, agitated." Sheri was lying on the stairs with her feet pointed downward. She was not breathing. Rodgers said he had not performed CPR because he did not want to hurt her. Livingston noticed a small bruise on the left side of Sheri's neck. Rodgers had fresh scratches on his face and head. Rodgers told Livingston that the family dog had scratched him.

Sheri's glasses were on the stairs. A pink scuba tank was at the bottom of the stairs. There was a pink mark on the wall next to the stairs. An "irregular

shaped" hole was in the drywall near the fourth step. Screws were missing from the center of the handrail on the steps. Sections of the handrail were also loose.

Shortly before emergency responders arrived, Rodgers' next door neighbor, Jan Thorton, opened her window. Thorton heard someone at the front of Rodgers' house sob, and say, "I didn't mean to hurt her."

Rodgers was hyperventilating when emergency responders arrived at the house. Medics noticed bruising on Sheri's neck and left eye. Rodgers had scratches on his face and head. Paramedic Yvonne North and Fire Battalion Chief Mike Voss observed Rodgers clawing at, and rubbing gravel on, his face and head. Voss opined that Rodgers was trying to cover up combat wounds.

Other friends arrived at Rodgers' house in the hours after the incident. Rodgers told them that he was helping Sheri move items the day of the incident and that Sheri was at the bottom of the stairs when he returned after temporarily leaving the room. Rodgers believed that Sheri had fallen down the stairs. Rodgers told Natasha and friends that he had been scratched by the dog.

Rodgers and Natasha began making funeral arrangements the same day. Rex Watt, the funeral director who arranged Sheri's disposition, met with Rodgers a few days after Sheri's death. Watt noted that Rodgers had fresh scratches on his face and head. Rodgers expressed a desire to cremate Sheri's remains. Rodgers also asked about the possibility of arranging a viewing so that his two sons could see Sheri. Watt had to determine whether the body was "viewable." After the embalmer suggested that Sheri's body not be viewed, Watt looked at it himself. Watt observed bruising on her head, eyes, and cheeks.

When Watt told Rodgers that a viewing would not be a good idea, Rodgers asked why Sheri did not appear black and blue at home. Rodgers also asked whether there was a mark on Sheri's neck. In response, Watt looked at Sheri's neck, where he observed what appeared to be a handprint. Watt later shared this information with the police.

Rodgers met with police and also explained to them that he was helping Sheri move items on the day of the incident. Sheri was at the bottom of the stairs when Rodgers returned after temporarily leaving the room. Police obtained a DNA sample from Rodgers and permission from him to search the house.

An autopsy was done on Sheri the day after the incident. Forensic pathologist Daniel Selove opined that Sheri had died of strangulation. Sheri had marks on her front left neck and a fractured larynx. Petechia[2] was also observed in Sheri's upper right eye. Selove believed these injuries to be inconsistent with those that a person would suffer from falling down the stairs. Selove ruled out positional asphyxiation as a possible cause of death.

Selove also opined that Sheri suffered non-deadly injuries consistent with falling down the stairs. Selove opined that injuries to Sheri's right hand, wrist, and forearm were consistent with defensive wounds. Police concluded that blood underneath one of Sheri's right fingernails matched Rodgers' DNA profile and the match was not expected to occur more frequently than one in "58 six trillion." Testing of Sheri's left hand showed the presence of male DNA but the amount was insufficient for testing. There was no physical damage to Sheri's

---

[2] Colored spots caused by bleeding into the skin.

fingernails.

Police took nail clippings from Rodgers' dog three days after the incident. Testing revealed no blood on the dog nail clippings.

Detective Jared Ely seized thumb drives and memory disks from Rodgers' house. Ely also seized a laptop computer from a dresser drawer in the master bedroom. He observed the same laptop in the kitchen of the house on the day of the incident. The name of the laptop was "Bill PC" and the laptop software was registered to "Bill."

The laptop contained Google Internet searches and e-mails to Nichols. Time stamps on the e-mails to Nichols matched time stamps indicating when Rodgers' username was logged in on the computer. A website that included "25 methods for killing with your bare hands" was accessed on May 5, 2012. Later activity at the same website included "ten tips to commit the perfect crime." This website was accessed for about seven minutes. Ely did not have the full Internet history for the laptop.

Specific searches were not performed for "ten tips to commit the perfect crime," and "25 methods for killing with your bare hands." Rather, Internet "cookies" for the websites were placed on the laptop. Ely opined that the "cookies" would not exist if the website had not actually been clicked on.

Between May 20 and 27, 2012, Internet searches were conducted for "how to break a [chicken's] neck," "how dangerous is it to fall down stairs," and "is it really possible to break someone's neck by twisting it with my hands like in the movies?" Ely opined that an Internet search for "how to break a neck" was

completed. Such a search was not contained in the laptop's Internet search history and Ely could not therefore determine an exact time frame in which such a search was conducted.

Information security officer, Leslie Trout, also examined Rodgers' laptop and disputed some of Ely's conclusions. Like Ely, Trout concluded that specific searches were not performed for "ten tips to commit the perfect crime," and "25 methods for killing with your bare hands." Rather, Internet "cookies" for the websites were placed on the laptop. Unlike Ely, however, Trout opined that the "cookies" would be placed on the laptop even if the website link was not actually clicked on. Trout found no evidence that a search was completed for "top ten prison survival tips."

Trout opined that a search was completed for "how to break a 'N.'" Google's function auto-completed "N" to include the word neck, and a link containing that search string was then clicked on. Trout concluded, "there wasn't sufficient evidence to show that the user searched for how to break a neck per se as much as it was auto-completed or how dangerous it is to fall down the stairs, but there were search strings that were part of that." Trout found no data files on the laptop that corroborated that either of the searches were clicked on and viewed.

There was also evidence of e-mails exchanged between Rodgers and Nichols. In one e-mail, Rodgers mentioned wanting to hit Sheri in the face. In another e-mail, Rodgers told Nichols he would give Sheri sleeping pills to avoid being sexually intimate with her. In late May 2012, Rodgers e-mailed Nichols

describing how upset he was that Sheri blamed him for the breakdown of his family's relationship. Shortly thereafter, someone allegedly conducted the Internet search for, "is it really possible to break someone's neck by twisting it with my hands like in the movies?"

About two and a half years after Sheri's death, Rodgers was interviewed separately by psychologist, Delton Young, and psychiatrist, Mark McClung. In these interviews, Rodgers gave a dramatically different account of the circumstances of Sheri's death than that which he had initially given to friends, family, and the police. Young and McClung came to different conclusions about Rodgers' account based on their interviews with him.

Young diagnosed Rodgers with PTSD, anxiety, and major depression. Rodgers described to Young the events leading up to the incident. Rodgers explained that he was roughhousing with the dog and pulling on Sheri's bathrobe in an effort to get her to play. Sheri refused because she had a meeting. The dog then scratched Rodgers and Sheri. In response, Sheri slapped Rodgers, which triggered a "dissociative flashback." Because of the "dissociative flashback," Rodgers believed he was being brutalized by his father and fighting for his life. Rodgers could not recall what happened to Sheri but, when his mental functioning cleared, he saw her lying motionless at the bottom of the stairs. Rodgers concluded that he must have strangled Sheri.

Rodgers denied to Young that he had completed the alleged Internet searches about killing someone with bare hands. Rodgers told Young that he made up the story about helping Sheri move equipment in an effort to delay his

arrest. Rodgers explained that he intended to use the extra time to get his children home, say goodbye, and then commit suicide.

Young opined that Rodgers' account of the incident was consistent with what would occur in a "severe violent dissociative flashback." Young opined that, if Rodgers had indeed experienced a dissociative flashback, his ability to form the requisite intent and understand the nature, quality, and wrongfulness of his alleged acts would have been "severely impaired." Young noted that he would not be surprised if Rodgers had engaged in self-harming behavior after the incident ended.

McClung also diagnosed Rodgers with PTSD and depression. In addition, McClung diagnosed Rodgers with antisocial and borderline personality trait disorder. Rodgers also described to McClung the events leading up to the incident. Rodgers reported that after coming up on Sheri with his forearm, he fell into a fetal position, and things became "foggy" before gradually clearing. Rodgers was uncertain how much time had passed.

Rodgers explained to McClung that he was engaging in self-harm when he rubbed gravel on his face and head. McClung questioned whether Rodgers intended to hide injuries by rubbing gravel on his face and head since his behavior was inconsistent with his normal self-harm habit of cutting himself. McClung opined that Rodgers' level of deceit exceeded even what he would expect from someone involved in an extramarital affair. McClung also believed that Rodgers' act of obtaining $15,000 from his mother-in-law to cover costs associated with Sheri's burial was inconsistent with someone intending to commit

suicide.

Unlike Young, McClung assumed that the alleged Internet searches were conducted by Rodgers. McClung explained that the Internet searches were significant, though not necessary, to his conclusions. McClung opined that Rodgers' reported dissociative experience of fighting back against his father was inconsistent with the lack of any reported instances in which Rodgers had previously acted out violently toward his father. McClung also believed there should have been more evidence of Rodgers previously experiencing dissociative experiences. McClung concluded that Rodgers' mental disorder did not interfere with his ability to know the identity of who he was attacking and did not render him incapable of forming the requisite intent for the incident.

The Skagit County prosecutor charged Rodgers by amended information with one count of first degree premeditated murder. A jury found Rodgers guilty as charged. The trial court sentenced Rodgers to 320 months of imprisonment. Rodgers timely appealed.

II

Rodgers contends that his right to a fair trial was violated. This is so, he asserts, because improper opinion testimony on guilt was presented at his trial. We disagree.

Opinions on guilt are generally improper whether made directly or by inference. State v. Quaale, 182 Wn.2d 191, 199, 340 P.3d 213 (2014). "Impermissible opinion testimony regarding the defendant's guilt may be reversible error because such evidence violates the defendant's constitutional

right to a jury trial, which includes the independent determination of the facts by the jury." Quaale, 182 Wn.2d at 199. Whether testimony is an impermissible opinion about guilt depends upon the circumstances. State v. Cruz, 77 Wn. App. 811, 814-15, 894 P.2d 573 (1995); City of Seattle v. Heatley, 70 Wn. App. 573, 579, 854 P.2d 658 (1993).

In determining whether statements are impermissible opinion testimony, the trial court will consider the circumstances of the case, including: "' (1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact.'" State v. Montgomery, 163 Wn.2d 577, 591, 183 P.3d 267 (2008) (internal quotation marks omitted) (quoting State v. Demery, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001)). "The point is to avoid having witnesses tell the jury what result to reach." State v. King, 135 Wn. App. 662, 673, 145 P.3d 1224 (2006).

A decision involving the admission of opinion testimony lies within the sound discretion of the trial court and will not be reversed unless abuse of discretion is shown. Heatley, 70 Wn. App. at 579. Discretion is abused if it is exercised on untenable grounds or for untenable reasons. State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

Rodgers contends that the State presented improper opinion testimony by Natasha, Nicholas, Thomson, and Nichols. The testimony at issue was as follows:

*Natasha*

Prior to trial, Rodgers sought to exclude evidence that, when he told

-11-

Natasha of her mother's death over the telephone, she responded, "What? Were you guys, were you guys fighting?" and "Were, well if you guys weren't fighting, what happened?" Natasha's statements were recorded because Rodgers was being interviewed at the police station at the time of the call. Rodgers objected both to the recording being played for the jury and to Natasha testifying to her reaction upon hearing the news of her mother's death.

Defense counsel argued that the statements were more prejudicial than probative under ER 403 because there was no history of physical violence or domestic violence between Rodgers and Sheri. The State maintained that "fighting" could include arguing and that any confusion about what Natasha meant could be dealt with on cross-examination. The trial court denied the motion to exclude.

Thereafter, the recording was played for the jury, and Natasha testified that, when Rodgers told her that her mother had died in an accident, "the very, very, very first thought that came into my gut and out of my mouth was: Were you guys fighting?" Natasha explained that there was never physical or domestic violence between her parents, but there were "screaming matches." Natasha further elaborated, "[a]nd when he told me that she fell down the stairs—and if they were fighting like I literally thought that he could have just pushed her down the stairs. Why would she slip?"

*Nicholas*

Rodgers' son, Nicholas, also testified about the first conversation that he had with his father after his mother's death. The following exchange transpired

-12-

between Nicholas and the prosecutor.

> Q: When did you find out that your mother had passed away?
> A: So I was with my unit in Korea. It was Memorial Day weekend. I received a Red Cross message. And the only thing it said is that I needed to get in touch with my family at home. I had no information. I finally called home. And I talked to my dad. And I knew immediately that—I said: Dad what happened? And he said: You just need to get home. So in my heart the way that he told me—
> Q: Hold on. He told you you needed to get home?
> A: Right
> Q: Did you ask him anything further?
> A: I was thinking about what was going on at home. I said: What happened?
> Q: Did he respond to that?
> A: No. He just said: You need to get home. Your mother has been in an accident. The way that he told me I knew in my gut, I wanted to say: Dad, what did you do? Because of his tone, I knew if it truly was a car accident, a spare [sic] of the moment thing, I believe he would lay it all out there for me. He wouldn't mask it in some way or form.

Nicholas also described speaking with his parents by telephone the night before Sheri's death. He testified as follows.

> Q: What did your dad say?
> A: It made me feel weird, but he laid out the entire next day to me. Oh, you know what we just prepaid for our new barbecue, and I'm going to pick it up tomorrow. I'm going to make a meal for your mother. And it's going to be a really nice Sunday.
> Q: Let me stop you there. You said it was weird. What about that was weird to you?
> A: It was the way he was telling me his schedule. That wasn't something that he did all the time. Like I said, our relationship was kind of strange throughout the whole year. This was out of the blue. It felt weird. At the same time I was thinking, okay, alright, alright. It made me feel weird. But after the fact, it still makes me feel weird. Because to me inside my heart it makes me feel like there was an agenda there ultimately; that he was trying to pick his alibi or something like that. That's just how it made me feel.

No objection was made to the quoted testimony.

*Thompson*

Thompson was asked during direct examination if he noticed anything about Rodgers' behavior after arriving at the house after Sheri's death:

> Q: Did you notice anything strange about how he [Rodgers] was acting at any point?
> A: Well, at one point he stared at me, gave me this look that made me doubt what had happened.
> Q: Why do you say that?
> A: It was just, I don't know how to describe it. It was a look of I knew in my head what did you do, Bill?
> Q: That was what you thought?
> A: That's what I thought.

Defense counsel objected on the basis that Thompson was speculating.

The State maintained that Thompson was properly describing his own personal reaction to Rodgers' action. The trial court overruled the objection.

*Nichols*

Finally, Nichols was asked about her telephone conversation with Rodgers a few days after the incident. The following exchange occurred:

> Q: And what was his—was he emotional when you were talking?
> A: Yes.
> Q: What did he sound like?
> A: He sounded sad.
> Q: Did you talk about anything else?
> A: I said I asked him about the dog, and he said that he had gotten scratched. And I said: Bill, are you sure that's what happened?
> And he said: Yes, that Sheri was upset that he was roughhousing with the dog.
> Q: Why did you ask if he was sure that was what had happened?
> A: I don't know.

No objection was made to Nichols' quoted testimony.

After the witnesses in question concluded their testimony, defense counsel sought to exclude future witnesses from testifying about "gut feels" that

-14-

Rodgers was responsible for Sheri's death. Defense counsel noted that, "[w]hether or not my client did anything wrong is a question reserved for the jury, not the individual witnesses." The trial court responded, "I've kind of been waiting for this issue to be raised. Because I had wondered—I mean to me, depending on how it's phrased, it does invade the province of the jury," and asked the State to articulate why such testimony was relevant.

The State maintained that the witnesses had properly testified to "their sensory reaction to a piece of information." It noted that many witnesses had known Rodgers for years and were entitled to express their opinions based on that knowledge. Nevertheless, the State offered to "do [its] best to kind of stay away from that," as long as the defense agreed to do the same. The trial court concurred, stating, "[c]ertainly speculation should not be encouraged." None of the purported opinion testimony forming the basis of Rodgers' appellate claim occurred thereafter.

Rodgers asserts that the witness testimony highlighted above constituted improper opinions on guilt. However, to the contrary, examining the statements in the context of the issues remaining after Rodgers admitted that he had, in fact, killed Sheri, it is clear that the testimony at issue did not constitute improper opinion testimony.

As described above, Rodgers initially denied that he had caused Sheri's death, claiming instead that she had fallen down the stairs of her own accord. When Rodgers subsequently admitted that he had strangled Sheri to death, he claimed that he had acted without premeditation, while in a dissociative state.

Thus, the central question in the case became Rodgers' mental state leading up to, and at the time of, the strangulation.

Key evidence regarding the plausibility of Rodgers' account that he had killed Sheri while in a trauma-induced dissociative state was presented through the testimony of Young and McClung. Each of them opined regarding the consistency of Rodgers' ultimate account of Sheri's death with his self-reported history of trauma and other evidence from the police investigation. But Young and McClung's testimony was far from the only evidence presented regarding Rodgers' state of mind leading up to the alleged crime. For example, evidence of Rodgers' morbid Internet searches and browsing activity was presented to support the State's theory that he had premeditated Sheri's death. The testimony at issue also falls within the general category of evidence of Rodgers' mental state.

Nearly all of the testimony at issue concerned the witnesses' reactions to Rodgers' initial denials that he was the cause of Sheri's death. Evidence that Rodgers' preliminary attempts to explain Sheri's death, without admitting that he strangled her, were met with disbelief or skepticism by two of his children, his good friend, and his mistress was relevant to his motivation for later dramatically changing his story. This evidence supports the notion that Rodgers changed his version of events after his preplanned story was received coldly by those personally closest to him. Further, this testimony provides an alternative account to Rodgers' own explanation that his description of events were faulty because they were concocted in haste and designed to give him just enough time to say

goodbye to his children before killing himself. Accordingly, the testimony in question was not improper opinion testimony but, rather, was relevant to what was ultimately the central issue in the case—Rodgers' consciousness of guilt at the time he strangled Sheri. See State v. Clark, 143 Wn.2d 731, 765, 24 P.3d 1006 (2001) (false information given to others considered admissible as evidence relevant to defendant's consciousness of guilt); accord State v. Allen, 57 Wn. App. 134, 143, 787 P.2d 566 (1990).

Only Nicholas's testimony regarding the telephone conversation with his father the night before his mother died requires a different explanation. Initially, it would be curious to regard this part of Nicholas's testimony as an opinion on guilt, given that he was describing an impression that was formed before the crime in question was committed. Nicholas was not testifying as to whether he thought that his father had killed his mother with premeditated intent; rather, he was explaining how his father's behavior on a telephone call that occurred the night before his mother's death made him feel.

Moreover, Nicholas was testifying to an impression that was formed based on his own observations. He recalled that he felt "weird" on the telephone call in question because his father's behavior on that call diverged notably from his behavior on prior calls. Washington courts have repeatedly found comparable comments admissible when, as here, they were based on factual observations that supported the witness's conclusion—even when those comments pertained to impressions formed *after* a crime was committed. See, e.g., State v. Stenson, 132 Wn.2d 668, 724, 940 P.2d 1239 (1997) (paramedic's testimony that he was

-17-

"surprised" that defendant was victim's husband was not improper); State v. Craven, 69 Wn. App. 581, 585, 849 P.2d 681 (1993) (emergency room worker properly testified that defendant's behavior was unusual); State v. Allen, 50 Wn. App. 412, 416-19, 749 P.2d 702 (1988) (police officer properly testified that defendant's sobbing did not look genuine or sincere); State v. Rafay, 168 Wn. App. 734, 807-08, 285 P.3d 83 (2012) (testimony that defendant's grin "kind of shocked" an officer could not reasonably be construed as direct comment on guilt or veracity; rather, "the comments were primarily an attempt to describe the defendants' demeanor").

We reject Rodgers' contention that the witness testimony at issue constituted improper opinion testimony on guilt.[3]

---

[3] Rodgers' claim regarding the testimony of Nicholas and Nichols also fails because he did not object to it in the trial court.

Only a manifest constitutional error may be raised for the first time on appeal, and a constitutional error is manifest only when the error caused actual prejudice or practical and identifiable consequences. State v. Kirkman, 159 Wn.2d 918, 934-35, 155 P.3d 125 (2007). Our Supreme Court addressed a claim that unobjected to improper opinion testimony constituted manifest constitutional error in State v. Montgomery, 163 Wn.2d 577, 183 P.3d 267 (2008). Therein, the court stated that, because the jury was properly instructed regarding its role and "[t]here was no written jury inquiry or other evidence that the jury was unfairly influenced," it "should [be] presume[d that] the jury followed the court's instructions absent evidence to the contrary." Montgomery, 163 Wn.2d at 596. The court also noted that, "when Montgomery did object . . . because the question went to the ultimate legal question, the court sustained the objection and the detective did not answer," which indicated that "[h]ad Montgomery raised objections [to the unobjected to opinion testimony] . . . they too would have been sustained and curative instructions given if requested." Montgomery, 163 Wn.2d at 596. It then concluded that the record in that case "[did] not establish actual prejudice." Montgomery, 163 Wn.2d at 596.

As in Montgomery, the jury herein was properly instructed that it was the sole judge of the witnesses' credibility, and, also like in that case, when Rodgers made a timely objection to improper opinion testimony, the trial court sustained the objection and took reasonable remedial action. Accordingly, Rodgers cannot raise his objection to the allegedly improper opinion testimony of Nicholas and Nichols for the first time on appeal.

III

Rodgers contends, in the alternative, that his counsel was ineffective for failing to object to the testimony that he now alleges was improper. Because the testimony in question was not improper, he is incorrect.

To prevail on a claim of ineffective assistance of counsel a defendant must demonstrate that: (1) counsel's representation was deficient, meaning it fell below an objective standard of reasonableness based on consideration of all of the circumstances; and (2) the defendant was prejudiced, meaning there is a reasonable probability that the result of the proceeding would have been different but for the challenged conduct. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If we decide that either prong has not been met, we need not address the other prong. State v. Garcia, 57 Wn. App. 927, 932, 791 P.2d 244 (1990).

As set forth above, the testimony in question did not constitute improper opinion testimony. Therefore, his counsel was not deficient for failing to object to its admission. Accordingly, his claim fails.

IV

Rodgers next contends that his Sixth Amendment right to confrontation was violated when records related to his Google account were authenticated based on a business records certification letter written by a Google employee who did not testify. We disagree.

> In Washington, the admission of business records is generally an exception to the hearsay rules. [ER 803(a)(6); RCW 5.45.010,

.020.] But, the admission of "testimonial" hearsay evidence violates the confrontation clause unless the proponent shows that the declarant is unavailable and that the accused had a prior opportunity to cross-examine the declarant. [State v. Kronich, 160 Wn.2d 893, 902, 161 P.3d 982 (2007) (citing Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)).] If evidence is not "testimonial," then no such showing is required. [Id. (quoting State v. Kirkpatrick, 160 Wn.2d 873, 882, 161 P.3d 990 (2007)).]

State v. Lee, 159 Wn. App. 795, 815, 247 P.3d 470 (2011).

We have consistently held that out-of-court statements offered for the limited purpose of authenticating a business record or public record are nontestimonial. See, e.g., Lee, 159 Wn. App. 795 (declaration from custodian of business records nontestimonial); State v. Mares, 160 Wn. App. 558, 248 P.3d 140 (2011) (certificate authenticating copy of defendant's driver's license nontestimonial).

Here, the Google employee's letter was offered for the sole purpose of authenticating the Google business records related to Rodgers' account. Thus, Rodgers' claim of error fails.

V

Rodgers' final contention is puzzling. He avers that he was "denied his sixth and fourteenth amendment [right] to the effective assistance of counsel," because "the decision to not request [a] lesser included offense instruction was not a tactical decision." However, the record demonstrates that his counsel did request instructions on the inferior degree crime of murder in the second degree and the potential lesser included offenses of manslaughter in the first and second degrees. These instructions were included in the defense's proposed

-20-

instructions and defense counsel argued on the record for them to be included in the court's instructions to the jury. Because the record belies Rodgers' contention, his claim fails.

Affirmed.

We concur: