FILED
COURT OF APPEALS
DIVISION II

2013 JUL 30 AM 10: 29

STATE OF WASHINGTON

BY
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42519-0-II |
| Respondent, | |
| v. | |
| CATHERINE ANNE BETTS, | UNPUBLISHED OPINION |
| Appellant. | |

HUNT, J. — Catherine Anne Betts appeals her jury trial convictions and exceptional sentences for first degree theft and money laundering; she also appeals her convictions for 19 other counts of filing a false or fraudulent tax return. Betts argues that the trial court (1) erred in denying her motion to change venue, (2) violated her Fourteenth Amendment right to due process by admitting evidence of her coerced statements to coworkers, (3) erred in admitting an ER 1006 summary of original documents that contained hearsay and violated her right to confrontation, (4) wrongly instructed the jury that it could aggregate theft offenses greater than third degree theft in order to convict her of first degree theft, (5) wrongly instructed the jury on the elements of filing a false or fraudulent tax return and improperly commented on the evidence, and (6) "penalized" her with an exceptional sentence for exercising her constitutional rights to remain silent and to a jury trial. Betts also argues that (7) the prosecutor committed reversible misconduct during cross examination, (8) the State presented insufficient evidence to support her

convictions for first degree theft and filing false or fraudulent tax returns, and (9) her convictions for first degree theft and money laundering constituted double jeopardy.

We affirm Betts's convictions, vacate her exceptional sentences, and remand for resentencing by a different judge. We also impose $350 sanctions on Betts's appellate counsel, Jordan B. McCabe, for violation of court rules and for material misrepresentations to this court.

FACTS

I. BACKGROUND

Catherine Anne Betts worked as a cashier for the Clallam County Treasurer's Office (the County) from January 2003 until May 19, 2009, when she admitted to several employees that she had taken money from the County. As County cashier, Betts received daily revenues from various County departments, conducted their banking, collected tax payments, cashed checks, and reconciled and balanced the County's accounts at the end of each day. The County could receive several hundred thousand dollars a day from its departments and taxpayers.

One of Betts's cashier responsibilities was to collect real estate excise tax[1] (REET) from sellers of real estate. When a person in the County sold real estate, he would submit a cash or check REET payment to the County, along with his deed and a REET affidavit. One of five County employees would accept the REET payment, stamp the affidavit with a sequential number, write the sequential number on the deed, attach the cash or check payment to the

---

[1] REET is a tax imposed upon the sale of real property. A seller of real estate must pay the tax before the auditor will record his deed. The REET is split between the State and the local entity, here, the County, although the "bulk" of the money goes to the State. 4 Verbatim Report of Proceedings (VRP) at 678.

affidavit, and leave it in Betts's cashier box. Although these five other employees could receive REET payments, all of the REET payments and REET affidavits were eventually given to Betts to process, to reconcile, and to use in balancing the County's accounts at the end of the day.

Betts was then responsible for entering information about the REET payments into a Microsoft Excel spreadsheet; she used this information to complete her daily account reconciliations. At the end of each month, Betts gave the County's treasurer's accountant, Anne Stallard, a "summary receipt" of the total amount of daily REET payments the County had received. 4 Verbatim Report of Proceedings (VRP) at 748. Relying on Betts's summary receipts, Stallard filed monthly tax "reports" with the Washington State Department of Revenue, detailing the amount of REET payments collected and remitting this money to the State as "unexpected revenue."[2] 4 VRP at 679, 683. Stallard submitted her monthly reports to the Department without independently checking Betts's daily accountings or cross-referencing her accountings with the REET affidavits received. According to Stallard, Betts was normally "very good" at ensuring that her accounts balanced each day. 4 VRP at 755. On May 18, 2009, however, Betts was unable to close out her accounts; she was "fidgety" and unable to concentrate. 4 VRP at 758. The next day, May 19, Betts was still unable to concentrate or to get her accounts to balance; and she appeared "flustered." 1 VRP at 74. Betts told coworkers that she was only "off by $299.32" and that she could not find the problem. 4 VRP at 759.

---

[2] These monthly tax reports functioned much like tax "returns." See 4 VRP at 728. The County remitted to the State the full amount of taxes it (the County) had received. Then, based on its monthly reports, the County would receive its portion of REET from the State.

When Betts went to lunch, Stallard and a couple other County employees reviewed Betts's accounts and discovered the error for the missing $299.32.[3] In reviewing Betts's accounts, the employees also found a suspicious $877.60 check for a REET payment, which was missing its accompanying REET affidavit; this check had not been entered into Betts's Excel spreadsheet of daily REET payments. Having discovered $299.32 when there was also an unaccounted for $877.60 check, Stallard was concerned and did not understand why Betts believed her accounts would balance.

Stallard discussed the problem with County Treasurer Judy Scott, who also served as Betts's supervisor. When Betts returned from lunch and was at her desk, Stallard and Scott asked Betts why the $877.60 REET check was not represented on the daily REET payments spreadsheet. Scott stepped away from the conversation. Betts then whispered to Stallard, "Don't look any further," and urged Stallard to go with her to the auditor's office. 4 VRP at 762.

Walking to the auditor's office with Stallard, Betts stopped outside the women's restroom, leaned against the wall, and suddenly started crying. VRP at 762. Stallard asked, "What['s] wrong?" 4 VRP at 762. Betts responded that she (Betts) had "ruined her life," that she "[didn't] want to go to jail," that she was "going to kill" herself and her girls, and that she "wanted to leave" the building. 4 VRP at 765-66. Concerned that Betts was threatening suicide, Stallard did not let her leave. Betts eventually confessed that she had taken "a couple excises,"

---

[3] According to Stallard, Betts had changed a deposit and had written it "completely wrong" in the accounting book such that "the book" was off by $299.32. 4 VRP at 759.

or "about $1,200" (including the $877.60 payment), from the County. 1 VRP at 82; 4 VRP at 766. At no point did Stallard order Betts to cooperate or to answer her questions.

Stallard urged Betts to tell Scott about the money because Scott was Betts's supervisor. Betts requested "moral support," so Stallard accompanied Betts to Scott's office; Betts was still visibly shaken and sobbing. 4 VRP at 767 Before Scott asked any questions, Betts spontaneously stated that she "had really messed up," that she had taken approximately "$800 to $1,200" from the County "on two different occasions," and that she did not want Scott to "turn her in" to the authorities. 1 VRP at 106, 107; 4 VRP at 711. Betts explained that she had taken money from the County by "exchang[ing a] check for cash" because she needed "flight money" to get away from her abusive husband; she again stated that she wanted to commit suicide. 1 VRP at 107; 4 VRP at 768. Betts made these disclosures without Stallard or Scott having ordered her to cooperate or to answer any questions.

Believing that Betts needed "counseling," Scott left her office to speak with the County's personnel director, Marge Upham. Stallard stayed behind with Betts, who again stated that she wanted to leave. 1 VRP at 107. Still concerned for Betts's safety, Stallard would not let Betts leave. When Scott returned, Stallard took Betts to Upham's office, where Betts discussed more of her problems at home. At the end of this meeting, Scott and Upham decided Betts needed an attorney, and they called a family lawyer for her.

Meanwhile, Stallard examined Betts's daily REET payments spreadsheet for evidence of a "tender exchange," namely Betts's having exchanged a check for cash, as she had disclosed. 4 VRP at 769. When Stallard manually added the figures on Betts's daily REET payments spreadsheet, she (Stallard) derived a total different from the one at the bottom of the spreadsheet;

she did not understand how this was possible. She also discovered a series of "hidden rows"[4] in the Excel spreadsheet, with around $80,000 represented in negative dollar amounts[5] in the last few months. 4 VRP at 772.

The County called the police and reported Betts's conduct to the County Auditor. The Auditor's Director of Special Investigations for fraud, James Brittain, conducted an investigation and reviewed eight boxes of Betts's daily REET reconciliations from June 2003 to May 2009. Brittain identified at least five schemes that had been used to misappropriate money from the County. He also noted that (1) the County's five employees shared passwords and had access to Betts's spreadsheets, (2) the total amount of money misappropriated from the County had increased over time (from $115,000 in 2006 to $198,000 in 2008), (3) the suspicious activity had ceased when Betts was on vacation, and (4) the number of tender exchanges had dropped dramatically after she was placed on administrative leave. Brittain discovered cash shortfalls of at least $617,000. Because Betts was the only person completing the daily REET account reconciliations, Brittain concluded that she was the *only* person who could have taken the money.

Port Angeles Police Department Detective Jason Viada obtained a search warrant for Betts's personal bank account records and credit card accounts. Viada discovered that, between 2004 and 2009, Betts had made cash deposits totaling nearly $150,000 more than she had earned

---

[4] To insert a "hidden row" into a Microsoft Excel spreadsheet, a person must either (1) right click with the mouse and then select "hide row[ ]" from the drop down menu; or (2) select this feature on the top menu of commands. 4 VRP at 788.

[5] Excel's auto sum feature calculated these negative figures; but they were not readily visible on the spreadsheet.

with her payroll checks and other explainable sources of income. She had also made over $66,000 in credit card payments between June 2007 and September 2009.

## II. PROCEDURE

The State charged Betts with (1) first degree theft, Count I; (2) money laundering, Count II; and (3) 19 counts of filing a false or fraudulent tax return, Counts III through XXI. The State alleged aggravating sentencing factors on the first degree theft and money laundering counts—that the crimes were a major economic offense or a series of offenses under RCW 9.94A.535(3)(d).

### A. Pretrial Motions

During a pretrial hearing, the State noted its belief that Betts might move to change venue based on pretrial publicity. When the trial court asked if this belief was accurate, Betts responded, "Yes, your Honor." 1 VRP at 61. The trial court informed Betts that, before deciding such motions, it normally waited to see whether it could seat an impartial jury. Nevertheless, the trial court instructed Betts to "go ahead and file" her motion, which the court would address before trial.[6] 1 VRP at 65. Betts responded, "We will." 1 VRP at 65. Betts,

---

[6] More specifically, the trial court stated:
> If you're going to make a motion for change of venue, . . . we'll deal with that during those three days [before trial]. But, you know, my normal procedure is—I know there's been publicity in this case, and my normal feeling on that is we really don't know whether or not a jury is going to be prejudiced or unable— we're unable to find a jury in Clallam County until we try to pick it.
> [. . .]
> So . . . my gut reaction is I don't think we're going to have any problem finding a jury that's going to be able to sit here, so—*but go ahead and file your motion. I think—if you need to do that, go ahead and do that so it'll be part of the record.*

1 VRP at 65 (emphasis added).

however, never filed a motion to change venue or raised the issue again, either before or after jury voir dire.

Before trial, Betts moved to suppress her statements to Stallard and Scott,[7] arguing that these statements were involuntary and inadmissible. According to Betts, (1) a County personnel policy required her "to [c]ooperate [w]ith a [j]ob [p]erformance [i]nvestigation" and that she could be disciplined or terminated for failing to do so; and (2) therefore, her statements to Stallard and Scott were inherently "coercive" and involuntary under *Garrity v. New Jersey*, 385 U.S. 493, 87 S. Ct. 616, 17 L. Ed. 2d 562 (1967). Clerk's Papers (CP) at 201; 1 VRP at 71.

At the CrR 3.5 suppression hearing, Stallard and Scott testified to the facts previously described. Betts admitted (1) having cashed the $877.60 REET check and having pocketed the money; (2) having spontaneously whispered, "Don't look any further," when Stallard showed her the $877.60 check without the accompanying REET affidavit; (3) having cried and having told Stallard that she wanted to "commit suicide" when Stallard asked what was wrong; and (4) having confessed to Stallard and to Scott that she had taken money from the County without anyone having ordered her to answer questions or to cooperate with a County investigation. VRP at 130, 135, 145-46. Betts also testified that she felt she needed to answer her supervisors' questions or she could be subject to discipline, although she was not aware of a specific County policy that required such cooperation.

---

[7] Betts also challenged her statements to Upham. But the State agreed it would not use Betts's statements to Upham as part of its case-in-chief; thus, the trial court did not discuss the admissibility of these statements in its findings of fact and conclusions of law.

Distinguishing the facts in *Garrity*, the trial ruled that Betts's statements to Stallard and Scott were not made under coercive conditions and were not the result of pressures or coercion that would render them involuntary. The trial entered findings of fact and conclusions of law, denied Betts's motion to suppress, and admitted the statements. Betts also stipulated pretrial that her underlying bank records were admissible as business records.

### B. Trial

The State's witnesses testified to the facts previously described. During Detective Viada's direct exam, the State referred to a written summary of Betts's bank account information, prepared by a Washington state attorney general's office employee and marked as exhibit 45. Viada explained that, although he had not personally created the summary marked as exhibit 45, he had prepared the initial summary on which exhibit 45 was based and that it was a "fair and accurate summar[y]" of the data that he had reviewed and included in his initial summary. 6 VRP at 1025. Betts objected to admission of this exhibit based on a lack of "foundation" and "personal knowledge." 6 VRP at 1025. Satisfied with the foundation, the trial court overruled the objection.

Betts testified in her own defense. VRP at 1112-93. She admitted (1) having cashed the $877.60 REET check and having taken it home with her, (2) having told Stallard, "You don't need to look [further]," when Stallard showed her (Betts) the $877.60 check without its accompanying affidavit, (3) having told Stallard and Scott that she (Betts) had cashed the $877.60 check, (4) having prepared monthly summary receipts of the total daily REET payments for Stallard, and (5) having known that Stallard relied on these receipts when she filed her monthly reports for the Department of Revenue. 6 VRP at 1140. Betts denied having taken any

money from the County other than the $877.60 and having created or used "hidden rows" on her daily REET payments spreadsheet. And she offered no explanation for the $150,000 in cash deposits in her personal bank account,[8] other than that her husband had usually given her $1,000 cash each month for living expenses and she had occasionally taken out cash advances from her credit card.

The prosecutor cross-examined Betts about her inability to explain the hidden rows on her daily REET payments spreadsheet, the large cash deposits in her personal bank account, and how she had been able to "balance" checks that did not exist. 7 VRP at 1188. The prosecutor then said:

> [STATE]: Ms. Betts, is there—without being able to explain any of that, is there anything else—last chance—is there something you want to tell us?
> [BETTS]: No.
> [STATE]: *It might make a difference [at] sentencing. It might make a difference to someone—*

7 VRP at 1189 (emphasis added). The trial court sustained Betts's objection, struck the prosecutor's statements and Betts's response from the record, and told the jury to disregard this colloquy.

On the fourth day of trial, Betts orally challenged the State's ability to aggregate second degree theft offenses, arguing that (1) RCW 9A.56.010(21)(c) allows aggregation of only third degree theft offenses, and (2) the "vast majority" of Betts's alleged thefts therefore could not be aggregated under the statute. V VRP at 925. The trial court reserved ruling on the issue. Two

---

[8] Toward the end of Betts's employment with the County, she was depositing close to $10,000 a month in cash into her bank account.

days later, after Betts rested her defense case, she moved for a ruling on her theft aggregation challenge, again arguing that only third degree thefts could be aggregated under the statute. Denying Betts's motion as "untimely," the trial court ruled that the State could aggregate any of the thefts that were "less than the $5,000 threshold [for first degree theft]," provided it could prove that such thefts were part of a common scheme or plan. 7 VRP at 1198.

During a hearing on jury instructions, Betts renewed her challenge to the State's ability to aggregate theft offenses greater than third degree theft. She objected to the trial court's giving Instruction 8, which defined the "value" for theft offenses as follows:

> Value means the market value of the property at the time and in the approximate area of the act.
>
> Whenever any series of transactions that constitutes theft is part of a common scheme or plan, then the sum of *the value of all transactions* shall be the value considered in determining the degree of theft involved.

CP at 84 (Instruction 8) (emphasis added); *see* 7 VRP at 1245. The trial court also instructed the jury about filing a false or fraudulent tax return:

> A person commits the crime of filing a false or fraudulent tax return when they make *or cause to be made* a false statement on a return with intent to defraud the State and evade the payment of a tax or part thereof.

CP at 96 (Instruction 20) (emphasis added). Betts neither objected to this instruction nor proposed an alternate instruction.

The jury found Betts guilty on all counts; in connection with her first degree theft and money laundering counts, the jury also returned special verdicts finding that these crimes constituted major economic offenses or a series of offenses under RCW 9.94A.535(3)(d). Based

11

on these special verdicts, the trial court imposed exceptional sentences for Betts's first degree theft and money laundering convictions.

For the first degree theft conviction, Count I, the trial court imposed an exceptional sentence term of 120 months of confinement, well above the standard range of 43 to 57 months. For the money laundering conviction, Count II, the trial court imposed an exceptional sentence by first imposing a standard-range sentence for the conviction and then running it consecutively[9] with both (1) the enhanced first degree theft sentence and (2) the standard range sentences on counts III—XXI for filing a false or fraudulent tax return. The trial court also ran Betts's standard range sentences on the filing a false or fraudulent tax return convictions, Counts III— XXI, concurrently with each other but consecutively to its exceptional sentences for first degree theft and money laundering. Betts's resultant term of confinement was for 144 months.

The trial court orally noted the following reasons for imposing the exceptional sentences on Betts's first degree theft and money laundering counts: (1) the crimes involved attempted or actual monetary losses substantially greater than typical for the crime (e.g., $5,000 for first degree theft); (2) the crimes involved a high degree of sophistication or planning; (3) the crimes occurred over a lengthy period of time; and (4) Betts had used her position of trust, confidence, or fiduciary responsibility to facilitate the commission of the crimes. These reasons for the exceptional sentences were included in the trial court's written findings and conclusions justifying its exceptional sentence. These reasons also mirrored the language in instructions 45

---

[9] *See* RCW 9.94A.535, amended by 2013 Wash. Legis. Serv. Ch. 84 (S.H.B. 1383) (WEST), without changing the substance applicable here; and RCW 9.94A.589(1)(a).

and 47, which defined "major economic offense or a series of offenses" for purposes of RCW 9.94A.535(3)(d), and were reasons that the jury considered in rendering its special verdicts.

In its oral sentencing ruling, the trial court also commented that Betts had not shown any "remorse" for the commission of her crimes. 8 VRP at 1390. The jury had not been asked to find whether Betts lacked remorse for the commission of crimes as part of its special verdicts. Nevertheless, the trial court stated that it "must factor" Betts's lack of remorse into its sentencing decision. 8 VRP at 1390. The trial court then directly addressed Betts by further noting:

> Once you were caught, there was never any offer on your part to participate in the investigation or insist in any way—now, I understand you have an absolute right to remain silent. You have an absolute right to have a jury trial. You exercised those rights. You cannot be punished for exercising those rights. [. . .]
> *On the other hand, there was another choice that you could have made that would have made your situation this morning considerably better as far as the Court is concerned; and you opted not to cooperate in any way*, to not express any remorse and to defend the case, which you have a right to do; but I am aware of the evidence, and the evidence was overwhelming. For example, you had no explanation at all, at all for how [the] $150,000 in cash found its way into your personal banking account over this period of time. No explanation at all. [. . .]
> *So what we ended up was, is having an enormously complicated and expensive trial that the jury costs were almost $9,000 alone, tens of thousands of dollars in investigative expenses on both sides.*

8 VRP at 1391-92 (emphasis added). Unlike the trial court's earlier reasons we discussed above, Betts's lack of remorse and the trial court's comments in this colloquy were not included in the

No. 42519-0-II

trial court's written findings and conclusions justifying its exceptional sentence.[10]

Betts appeals her convictions and exceptional sentences.

ANALYSIS

I. CHANGE OF VENUE

Betts first argues that the trial court erred in denying her motion to change venue. The record, however, shows neither that Betts moved to change venue nor that the trial court denied such a motion. Because the record does not support her underlying factual allegations, the argument fails at the outset and we do not address its merits.[11]

II. STATEMENTS NOT COERCED

Betts next argues that the trial court violated her right to due process under the Fourteenth Amendment[12] by admitting the statements she made to Stallard and Scott. She contends that (1) the County had a personnel policy requiring employees to cooperate in internal investigations;

---

[10] In support of its exceptional sentences, the trial court entered findings of fact and conclusions of law, paraphrased as follows: (1) the jury found both the first degree theft, Count I, and money laundering, Count II, to be major economic offenses under RCW 9.94A.535(3)(d), which was not an element required to prove either offense; and (2) Betts "repeatedly violat[ed] her position of trust and fiduciary responsibility" by engaging "over a lengthy period of time in a sophisticated scheme that resulted in the theft of money of a value substantially greater than typically seen for these types of crimes." CP at 15 (Conclusion of Law (CL) 7).

[11] But even assuming, without deciding, that the trial court should have construed Betts's pretrial colloquy as an oral motion to change venue, she failed to support such "motion" with affidavits or other proof of prejudice, as the law requires. RCW 4.12.030; CrR 5.2(b)(2); *State v. Eppens*, 30 Wn. App. 119, 127, 633 P.2d 92 (1981).

[12] U.S. CONST. amend. XIV.

14

(2) employees could be disciplined for failing to comply with this policy;[13] and (3) therefore, her statements to Stallard and Scott were inadmissible because they were "coerced" and "involuntary" under *Garrity.* Br. of Appellant at 14, 19. We disagree.

In reviewing a trial court's denial of a suppression motion, we determine whether substantial evidence supports the trial court's findings of fact and whether the findings support the trial court's conclusions of law. *State v. Ross,* 106 Wn. App 876, 880, 26 P.3d 298 (2001). Substantial evidence exists when there is a sufficient quantity of evidence to "persuade a fair-minded, rational person of the truth of the finding." *State v. Hill,* 123 Wn.2d 641, 644, 870 P.2d 313 (1994). We review conclusions of law de novo. *State v. Johnson,* 128 Wn.2d 431, 443, 909 P.2d 293 (1996). And we treat unchallenged findings of fact as verities on appeal. *Hill,* 123 Wn.2d at 644. A defendant is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession. *Jackson v. Denno,* 378 U.S. 368, 376, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). A "voluntary" confession is one that is the product of the defendant's own free will and judgment. *State v. Unga,* 165 Wn.2d 95, 101-02, 196 P.3d 645 (2008). The inquiry is whether, under the totality of the circumstances, "the [defendant's] confession was coerced." *State v. Broadaway,* 133 Wn.2d 118, 132, 942 P.2d 363 (1997).

---

[13] Ex. 1.

Citing *Garrity*,[14] Betts argues that her statements were similarly coerced because the County had a personnel policy that required her to cooperate in internal investigations. We agree with the trial court's distinguishing *Garrity* on its facts because, here, Stallard and Scott never referenced the personnel policy, Betts admitted that she did not fully understand the policy, and the personnel policy did not require the type of reporting or face dismissal that the *Garrity* policy required. The trial court's written findings of fact and conclusions of law contained the following findings: (1) Stallard's and Scotts' primary concern was to ensure Betts's safety, "not to obtain . . . evidence of criminal activity"; (2) Betts's initial whispered statements to Stallard were "entirely voluntary" and were "not elicited by any questions"; and (3) Betts's later statements to Stallard and Scott were *not* made under "coercive" conditions. CP at 192. Betts did not assign error to these findings of fact; thus, they are verities on appeal.[15] *Hill*, 123 Wn.2d

---

[14] In *Garrity*, the New Jersey Attorney General investigated police officers for fixing traffic tickets. *Garrity*, 385 U.S. at 494. As required by a state statute, before being questioned the police officers were advised that (1) anything they said could be used against them in a criminal proceeding; (2) they had the privilege to refuse to answer; but (3) if they refused to answer, they could be removed from office. *Garrity*, 385 U.S. at 494. The United States Supreme Court held that these conditions were inherently coercive because the police officers were given a choice either to "forfeit their jobs or to incriminate themselves," and, therefore, they could not be used against the defendants in a criminal proceeding. *Garrity*, 385 U.S. at 497-98, 500.

[15] Similarly, Betts does not challenge the following findings of fact, which are also are verities on appeal:

> 1. The primary concern of Ms. Stallard and Ms. Scott was not to obtain admissible evidence of criminal activity, but rather to assure the physical safety of the defendant.
> 2. This concern was the primary reason that the defendant was not left alone after her initial breakdown outside the Auditor's Office.
> 3. *The defendant's initial whispered requests* that Ms. Stallard not look further into the accounting discrepancy *were entirely voluntary* and *not elicited by any questions*.

at 644. These unchallenged findings support the trial court's conclusion of law that all of Betts's statements to Stallard and Scott were voluntary and were not the product of pressure or coercion. We hold that the trial court did not violate Betts's due process rights in admitting her statements at trial.

### III. NO HEARSAY OR CONFRONTATION CLAUSE VIOLATION

Betts next argues that the trial court erred in admitting exhibit 45 as a written summary of her personal bank account information. As mentioned above in the facts section, an attorney general office employee had prepared exhibit 45 based on Detective Viada's initial summary of Betts's bank account information. Although Viada laid the foundation for this evidence at trial and testified that exhibit 45 was a fair and accurate representation of his initial summary and the data he had reviewed, Betts contends that exhibit 45 was inadmissible because it (1) contained "triple hearsay" and (2) violated Betts's right to confrontation. Br. of Appellant at 43. Again, we disagree.

### A. Standard of Review

We review a trial court's decision to admit or to exclude evidence for abuse of discretion. *State v. Stenson*, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997). A trial court abuses its discretion

---

4. The defendant's statements to Ms. Stallard made outside the Auditor's Office were made after the defendant had begun to cry and were in response to Ms. Stallard asking[,] "What is wrong?"
5. *The encounter outside the Auditor's Office was not coercive.*
6. The defendant's statements made in Ms. Scott's office were made in response to Ms. Scott asking[,] "What happened?" when the defendant and Ms. Stallard returned to her office and it appeared that the defendant had been crying.
7. *The encounter in Ms. Scott's office was not coercive.*

CP at 192 (emphasis added).

if its decision "is manifestly unreasonable or based upon untenable grounds or reasons." *Stenson*, 132 Wn.2d at 701. We review alleged confrontation clause violations de novo. *Lilly v. Virginia*, 527 U.S. 116, 137, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999); *State v. Jasper*, 174 Wn.2d 96, 108, 271 P.3d 876 (2012).

### B. Not Hearsay

Betts first argues that exhibit 45 was inadmissible "triple hearsay" because it recreated Viada's initial summary of Betts's bank account information. Br. of Appellant at 43. Betts, however, did not object to this evidence on hearsay grounds at trial. Instead, she objected that Viada lacked "personal knowledge" and that the State had not laid the proper "foundation" for the exhibit. 6 VRP at 1025. This objection was insufficient to preserve Betts's "triple hearsay" objection for appeal.

To preserve an evidentiary objection for appeal, the defendant must make a specific objection at the trial court. ER 103(a)(1); *State v. Harris*, 154 Wn. App. 87, 94, 224 P.3d 830 (2010). If the defendant objects to the admission of evidence on one ground at trial, she may not assert a different ground for excluding the evidence on appeal. *State v. Price*, 126 Wn. App. 617, 637, 109 P.3d 27, *review denied*, 155 Wn.2d 1018 (2005). Because Betts did not object to this evidence on hearsay grounds at trial, we hold that she failed to preserve this issue for appeal.

### C. No Implication of Confrontation Clause

For the first time on appeal, Betts also argues that the trial court violated her confrontation rights by admitting exhibit 45 because (1) the "bank records" underlying exhibit 45 were "testimonial hearsay," and (2) she did not have the opportunity to cross-examine the bank employee who provided the records to law enforcement. Br. of Appellant at 43. We disagree.

The United States Constitution's Sixth Amendment Confrontation Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. This right "applies to 'witnesses' against the accused . . ., those who 'bear testimony.' 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Jasper*, 174 Wn.2d at 109 (internal quotation marks omitted) (quoting *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)). "Testimonial" hearsay statements may not be introduced against a defendant at trial unless the proponent of the evidence shows that (1) the declarant witness is unavailable and (2) the defendant had a prior opportunity to cross-examine the declarant witness. *Crawford*, 541 U.S. at 68; *State v. Lee*, 159 Wn. App. 795, 815, 247 P.3d 470 (2011), *review denied*, 302 P. 3d 181 (2013). If the hearsay statements are not "testimonial," however, they do not implicate the Confrontation Clause and no such showing is required. *State v. Hubbard*, 169 Wn. App. 182, 187, 279 P.3d 521 (2012); *Lee*, 159 Wn. App. at 815.

In *Crawford*, the United States Supreme Court described the following statements as comprising the "core class" of testimonial statements:

> "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; . . . "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and "*statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.*"

*Crawford*, 541 U.S. at 51-52 (emphasis added) (internal quotation marks and citations omitted). More recent United States Supreme Court cases have also held that documents specifically

19

prepared for use in a criminal proceeding fall within this core class of testimonial statements. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11, 324, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009) (holding three forensic "certificates of analysis" stating that a substance tested positive as cocaine were testimonial); *see also Bullcoming v. New Mexico*, ___ U.S. ___, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011); *Jasper*, 174 Wn.2d at 112.

Betts does not contend that the trial court violated her right to confrontation because the exhibit 45 *summary itself* (as the third level of hearsay) was testimonial and that she did not have the prior opportunity to cross-examine the attorney general office employee who prepared it. Instead, she challenges the testimonial nature of *only* the underlying bank records themselves (the first layer of hearsay in exhibit 45). According to Betts, her bank records fall within *Crawford*'s core class of testimonial statements because "an unidentified bank employee" gave the bank records to the police in compliance with a search warrant; and thus, the employee could have reasonably "expected [the bank records] to be used in a criminal proceeding." Br. of Appellant at 43. This argument fails.

Betts's argument confuses the bank records' *creation* (when the bank records' "statements" were made) with the employee's physical *act* of turning over the bank records to another (which itself is not necessarily testimonial). The record on appeal shows that (1) Betts's bank records were already in existence when the police served their search warrant, and (2) these bank records had been made during the course of the bank's regularly conducted business practices. Thus, Betts fails to show that any statements contained in the bank records were made "under circumstances which would lead an objective witness reasonably to believe that the

statement would be available for use at a later trial." *Crawford*, 541 U.S. at 52 (internal quotation marks omitted).

Moreover, Betts stipulated pretrial that the underlying bank records were admissible as "business records." 2 VRP at 195. Although a business record admissible under a hearsay exception may be excluded if it violates the Confrontation Clause, certain statements "by their nature [are] not testimonial—for example, *business records* or statements in furtherance of a conspiracy." *Crawford*, 541 U.S. at 56 (emphasis added). The United States Supreme Court recently reaffirmed this principle in *Melendez-Diaz*:

> Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—*having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial.*

*Melendez-Diaz*, 557 U.S. at 324 (emphasis added). Again, nothing in the record suggests that Betts's bank records were prepared for the purpose of establishing or proving a fact necessary to Betts's crimes at trial. Instead, the bank records were prepared for administering the bank's affairs. We hold that Betts's bank records were not testimonial and that the trial court did not err in admitting their summary, exhibit 45.

## IV. No Prosecutorial Misconduct

Next, Betts argues that during her cross-examination the prosecutor committed misconduct that warrants reversal of her convictions. She contends that the prosecutor expressed an improper opinion on her guilt when he highlighted her inability to explain the hidden rows in her daily REET payments spreadsheet and her large cash bank deposits by stating, "Ms. Betts . . . last chance—is there something else you want to tell us?" because "[i]t might make a difference

21

at sentencing." Br. of Appellant at 46 (quoting 7 VRP at 1189). The State concedes that the prosecutor's questioning was improper, but it argues that Betts fails to show prejudice. We agree with the State.

A defendant claiming prosecutorial misconduct bears the burden of demonstrating "that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial." *State v. Miles*, 139 Wn. App. 879, 885, 162 P.3d 1169 (2007). Prejudice occurs only if there is "a substantial likelihood the instances of misconduct affected the jury's verdict." *State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995). An objection and an appropriate jury instruction may cure any resulting prejudice. *See State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008). Where a defendant objected at trial or moved for a mistrial on the basis of prosecutorial misconduct, we give deference to the trial court's ruling because "'[t]he trial court is in the best position to most effectively determine if prosecutorial misconduct prejudiced [the] defendant's right to a fair trial.'" *Stenson*, 132 Wn.2d at 719 (internal quotation marks omitted) (quoting *State v. Luvene*, 127 Wn.2d 690, 701, 903 P.2d 960 (1995)); *see also State v. Ish*, 170 Wn.2d 189, 195-96, 241 P.3d 389 (2010).

The State may not assert a personal opinion about the defendant's guilt or a witness's credibility. *State v. McKenzie*, 157 Wn.2d 44, 53, 134 P.3d 221 (2006); *State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984). In asking Betts whether she had anything to add because "[i]t might make a difference [at] sentencing," the prosecutor implied that he believed she was

No. 42519-0-II

guilty and would soon be sentenced by the trial court. 7 VRP at 1189. We accept the State's concession that this was improper cross-examination questioning.[16]

Betts, however, fails to demonstrate that this improper opinion prejudiced her: She does not show a substantial likelihood that the prosecutor's statements affected the jury's verdict. When Betts objected to the prosecutor's questioning, the trial court sustained the objection, struck the prosecutor's statements and Betts's response from the record, and instructed the jury to disregard the testimony. The trial court's final instructions to the jury also informed the jurors:

> The lawyers' remarks, statements, and arguments . . . are not evidence. The evidence is the testimony and the exhibits. The law is contained in my instructions to you. *You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.*

CP at 76 (Instruction 1) (emphasis added). This instruction further provided: "If evidence was not admitted or was *stricken from the record*, then you are not to consider it in reaching your verdict." CP at 75 (Instruction 1) (emphasis added).

We presume that the jury followed the trial court's instructions. *State v. Swan*, 114 Wn.2d 613, 661-62, 790 P.2d 610 (1990). Here, the trial court's instructions substantially cured any prejudice resulting from the prosecutor's improper cross-examination questioning of Betts,

---

[16] We note, however, that because Betts admitted to having taken "about $1200" from the County, sentencing was likely.

23

especially in light of the strength of the State's evidence.[17] Because Betts fails to demonstrate prejudice, her prosecutorial misconduct claim fails.

## V. JURY INSTRUCTIONS

Betts further argues that the trial court erroneously instructed the jury (1) on the elements of filing a false or fraudulent tax return and (2) on aggregation of theft offenses greater than third degree theft to convict Betts of first degree theft. She also argues that the trial court's erroneous instruction on filing a false or fraudulent tax return constituted a judicial comment on the evidence. These arguments fail.

### A. Standard of Review

We review instructional errors de novo, evaluating the challenged instruction "'in the context of the instructions as a whole.'" *In re Pers. Restraint of Hegney*, 138 Wn. App. 511, 521, 158 P.3d 1193 (2007) (quoting *State v. Benn*, 120 Wn.2d 631, 654-55, 845 P.2d 289 (1993)). Jury instructions are "not erroneous if, taken as a whole, they properly inform the jury of the applicable law, are not misleading, and permit the defendant to argue his or her theory of the case." *State v. Wilson*, 117 Wn. App. 1, 17, 75 P.3d 573 (2003). Even if an instruction may be misleading, we will not reverse for this reason unless the complaining party shows prejudice. *State v. Aguirre*, 168 Wn.2d 350, 364, 229 P.3d 669 (2010).

---

[17] Betts also moved for a mistrial on the basis of this prosecutorial misconduct. The trial court denied the mistrial motion, noting that it had previously sustained Betts's objection, instructed the jury to disregard the question and the response, and believed this was "sufficient" and that the prosecutor's questioning did not "rise[ ] to the level of mistrial material." 7 VRP at 1248. We accord deference to the trial court's ruling because the trial court was in the best position to determine whether the prosecutor's improper cross-examination questioning prejudiced Betts's right to a fair trial. *Stenson*, 132 Wn.2d at 719.

Furthermore, if a party fails to object to a jury instruction below, she waives a claim as to the instructional error on appeal unless she can demonstrate that the instructional error was a "manifest error affecting a constitutional right." RAP 2.5(a)(3); *State v. Edwards*, 171 Wn. App. 379, 387, 294 P.3d 708 (2012). Under this standard, the defendant has the initial burden of showing that (1) the error was "'truly of constitutional dimension'" and (2) the error was "'manifest.'" *State v. Grimes*, 165 Wn. App. 172, 185-86, 267 P.3d 454 (2011) (quoting *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009)), *review denied*, 175 Wn.2d 1010 (2012). A defendant cannot simply assert that an error occurred at trial and label the error "'constitutional'"; instead, he must identify an error of constitutional magnitude and show how the alleged error actually affected his rights at trial. *Grimes*, 165 Wn. App. at 186 (citing *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011)). If the defendant successfully shows that a claim raises a manifest constitutional error, then the burden shifts to the State to prove that the error was harmless beyond a reasonable doubt. *Grimes*, 165 Wn. App. at 186 (citing *Gordon*, 172 Wn.2d at 676 n.2).

### B. Filing False or Fraudulent Tax Return

Betts argues that the trial court erroneously instructed the jury on the elements of filing a false or fraudulent tax return because Instruction 20, which defined the crime, included extra words not expressly included in the criminal statute and constituted an improper comment on the evidence. Betts did not object to this instruction at trial; and she fails to argue on appeal that the alleged instructional error was a manifest error affecting a constitutional right that she can raise for the first time on appeal under RAP 2.5(a)(3). Therefore, we do not further consider these

25

arguments. RAP 2.5(a)(3); *State v. Bertrand*, 165 Wn. App. 393, 402-03, 267 P.3d 511 (2011), *review denied*, 175 Wn.2d 1014 (2012).

## C. Aggregating Thefts

Betts also argues that the trial court erroneously instructed the jury on the types of theft offenses that may be aggregated. According to Betts, Instruction 8 erroneously defined the term "value" for theft offenses because (1) RCW 9A.56.010(21)(c)[18] provides that multiple acts of third degree theft may be aggregated; and (2) Instruction 8 implied that the jury could aggregate *any* of Betts's individual acts of theft alleged by the State, regardless of whether the individual act would have constituted third degree theft or a greater theft offense. Br. of Appellant at 31. The State responds that the trial court's jury instruction was proper because RCW 9A.56.010(21)(c) does not abrogate a prosecutor's common law ability to aggregate theft offenses that are part of a single criminal episode or common scheme or plan. We agree with the State.

---

[18] RCW 9A.56.010(21)(c) provides:

> Except as provided in RCW 9A.56.340(4) and 9A.56.350(4), *whenever any series of transactions which constitute theft, would, when considered separately, constitute theft in the third degree because of value*, and said series of transactions are a part of a criminal episode or a common scheme or plan, then the transactions may be aggregated in one count and the sum of the value of all said transactions shall be the value considered in determining the degree of theft involved.
>
> For purposes of this subsection, "criminal episode" means a series of thefts committed by the same person from one or more mercantile establishments on three or more occasions within a five-day period.

(Emphasis added). The Legislature amended this statute in 2006 and 2011, but these amendments do not affect the substance of this provision or our analysis in this opinion.

26

Betts objected to the trial court's Instruction 8 defining "value" in the proceedings below. Therefore, she has preserved this issue for appeal. But this argument fails on the merits.

Instruction 8, taken verbatim from 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 79.20 (3d ed. 2008), defined "value" as

> the market value of the property at the time and in the approximate area of the act. Whenever any series of transactions that constitutes theft is part of a common scheme or plan, then *the sum of the value of all transactions* shall be the value considered in determining the degree of theft involved.

CP at 84 (Instruction 8) (emphasis added). Betts appears to argue that Instruction 8's "the sum of the value of all transactions" language was improper because (1) RCW 9A.56.010(21)(c) provides that a jury may aggregate third degree theft offenses; and (2) the statute does not provide for aggregation of other theft offenses. This argument ignores the State's common law ability to charge sufficiently related theft offenses as a single crime.

"Aggregation of individual transactions to meet the threshold for a particular degree of theft is allowed by common law *and* by statute." *State v. Atterton*, 81 Wn. App. 470, 472, 915 P.2d 535 (1996) (emphasis added). Common law allows thefts to be aggregated (1) if the defendant commits a series of thefts from the same owner and the same place and each taking was the result of "a single criminal impulse pursuant to a general larcenous scheme"; and (2) if the defendant commits a series of thefts from the same victim over a period of time or from several victims at the same time and place, provided the takings were "part of a common scheme or plan." *Atterton*, 81 Wn. App. at 472 (citing *State v. Vining*, 2 Wn. App. 802, 808, 472 P.2d 564 (1970); and *State v. Meyer*, 26 Wn. App. 119, 124, 613 P.2d 132 (1980)). Washington courts have also applied these common law theft aggregation principles in situations where, as

27

here, a defendant's individual acts of theft may have each been greater than the value amount constituting third degree theft. *See, e.g., State v. Barton*, 28 Wn. App. 690, 691, 626 P.2d 509 (aggregating defendant's five acts of presenting forged bank withdrawal slips of $3,000 each to constitute one first degree theft offense), *review denied*, 95 Wn.2d 1027 (1981).

Betts appears to argue that RCW 9A.56.010(21)(c) abrogates these common law theft aggregation principles because the statute discusses aggregation only in relation to third degree theft. Division One of this court, however, has previously rejected a similar argument where a defendant presented forged bank withdrawal slips, each for $3,000, to the same bank on five occasions to withdraw money fraudulently from his brother's savings account. *Barton*, 28 Wn. App. at 691. The State charged Barton with one count of first degree theft, even though each act of theft would have separately constituted only second degree theft. *Barton*, 28 Wn. App. at 691, 694. Barton argued on appeal that the State had improperly charged him with first degree theft because RCW 9A.56.010[19] permitted aggregation of only third degree thefts. *Barton*, 28 Wn. App. at 694. Division One noted that (1) nothing in the express language of RCW 9A.56.010 "purport[ed] to abrogate the common law" theft aggregation principles; and (2) under RCW 9A.04.060, the "[p]rovisions of the common law supplement penal statutes to the extent they are consistent." *Barton*, 28 Wn. App. at 694-95. Division One held that the common law theft aggregation principles allowing the State to charge a series of related thefts as one crime were

---

[19] The *Barton* opinion cited former RCW 9A.56.010 (1976). Although the Legislature has amended this statute several times since 1976, the provision allowing aggregation of thefts that are part of a common scheme or plan has remained virtually unchanged since *Barton*. Thus, we cite the current version of the statute.

consistent with RCW 9A.56.010 because RCW 9A.56.010 was a more specific theft aggregation statute. *Barton*, 28 Wn. App. at 695.

Here, the State argued that Betts was guilty of first degree theft under the second common law requirement—that Betts's thefts were from the same victim over a period of time and were part of a common scheme or plan. Adopting *Barton*'s analysis, we hold that (1) RCW 9A.56.010(21)(c) did not abrogate the State's ability to aggregate a series of sufficiently related thefts of any degree under common law; and (2) the trial court's Instruction 8 was not erroneous in stating that the jury could aggregate "the sum of the value of all transactions" if the thefts were part of a common scheme or plan.

VI. SUFFICIENCY OF EVIDENCE

Betts next argues that the State presented insufficient evidence to support her convictions for first degree theft and filing a false or fraudulent tax return. We disagree.

A. Standard of Review

When reviewing a sufficiency of the evidence challenge, we ask whether, "after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (en banc). Circumstantial evidence and direct evidence are equally reliable. *State v. Moles*, 130 Wn. App. 461, 465, 123 P.3d 132 (2005). On appeal, we defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the

evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004) (citing *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985)).

## B. First Degree Theft

To convict Betts of first degree theft, the State needed to prove that she committed theft of "[p]roperty or services which exceed(s) five thousand dollars in value other than a firearm as defined in RCW 9.41.010." RCW 9A.56.030(1)(a).[20] RCW 9A.56.020(1)(a)[21] defines "theft" as "wrongfully obtain[ing] or exert[ing] unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services."

Here, the evidence showed that, as the County's cashier, Betts had access to large amounts of money and was responsible for reconciling the County's REET accounts at the end of each day. Although other employees may have also accepted REET payments, Betts was the only employee responsible for processing these payments and imputing this information into her daily REET payments Microsoft Excel spreadsheet. Moreover, Betts readily admitted to Stallard and Scott that she had taken "a couple excises," or around "$800 to $1,200," from the County and that she had done so by "exchang[ing] a check for cash" (i.e., a tender exchange). 1 VRP at 82, 4 VRP at 711, 767.

When the County and the police investigated Betts's admitted tender exchange thefts, they discovered that (1) she had around $80,000 in "hidden rows" in her daily REET payments

---

[20] The Legislature amended this statute in 2007, 2009, and 2012, but these amendments do not affect the substance of this provision or our analysis here.

[21] The Legislature amended this statute in 2004, but these amendments do not affect our analysis here.

30

spreadsheet; (2) someone had misappropriated at least $617,000 from the County using five schemes, including tender exchanges; (3) the suspicious activity ceased when Betts was on vacation; (4) the number of tender exchanges dropped when Betts was on administrative leave; and (5) between 2004 to 2009, Betts had made nearly $150,000 in cash deposits in excess of her payroll and other explainable sources of income. Brittain testified that only Betts could have perpetrated the crimes because she was the only person who reconciled and balanced the daily REET accounts. This evidence was sufficient for a rational trier of fact to have found the essential elements of first degree theft beyond a reasonable doubt.

Betts primarily challenges the adequacy of Brittain's investigation methods for determining that she had taken the full $617,000 amount from the County and his conclusion that Betts was the only person who could have perpetrated the crimes. Betts argues that, without Brittain's testimony, (1) the only evidence that showed she had wrongfully obtained or exerted unauthorized control over the property of another was her admission that she had cashed the $877.60 REET check; and (2) this evidence was not sufficient to convict her of first degree theft because the first degree theft statute requires theft in *excess* of $5,000. We do not find these arguments persuasive; at most, they raise questions about Brittain's credibility and the proper weight of his testimony, which were issues for the jury to decide. *See State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990); *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533, *review denied*, 119 Wn.2d 1011 (1992).

Furthermore, Stallard also testified that she had discovered over $80,000 in hidden rows on Betts's daily REET payments spreadsheet. Even if the jury believed that this $80,000 represented the *entire* amount of money that Betts had unlawfully taken from the County, this

amount alone would have been sufficient to establish the value element required for first degree theft. Viewing the evidence and reasonable inferences in the light most favorable to the State, we hold that the State presented sufficient evidence to support Betts's first degree theft conviction.

### C. Filing False or Fraudulent Tax Return

Betts also argues that the State presented insufficient evidence to support her convictions for filing false or fraudulent tax returns. Again, we disagree.

The State charged Betts with 19 counts of complicity in filing a false or fraudulent tax return, under RCW 82.32.290(2)(a)(iii)[22] and RCW 9A.08.020.[23] RCW 82.32.290(2)(a)(iii) provides that it is unlawful "[f]or any person to make any false or fraudulent return or false statement in any return, with intent to defraud the state or evade the payment of any tax or part thereof." The relevant portion of the complicity statute, RCW 9A.08.020, also provides:

(1) A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable.
(2) A person is legally accountable for the conduct of another person when:
        (a) Acting with the kind of culpability that is sufficient for the commission of the crime, *he or she causes an innocent or irresponsible person to engage in such conduct.*

(Emphasis added). Thus, in order to convict Betts of filing a false or fraudulent tax return under a complicity theory, the State needed to present evidence that Betts (1) had caused an innocent or

---

[22] The Legislature amended this statute in 2009 and 2010, but these amendments do not affect this statutory provision or our analysis here.

[23] The Legislature amended this statute in 2011 to add gender-neutral language. These amendments do not affect our analysis here.

irresponsible person to file a false or fraudulent tax return or to make a false statement in any return and (2) did so with intent to defraud the State or to evade paying tax.

The State met its burden here. The State presented evidence at trial that Betts had been unlawfully taking REET payments for several years and had hidden this information from her supervisors, Stallard and Scott. Although Betts did not personally file any REET tax returns with the State, she submitted monthly summary receipts to Stallard that contained false representations about the total amount of daily REET payments the County received. Stallard relied on these false representations when submitting the County's monthly reports to the Department of Revenue, which detailed the amount of REET payments received and remitted the money to the State.[24] The State also presented evidence that Stallard did not know about Betts's theft and money laundering schemes and did not independently check Betts's daily REET account reconciliations before filing the County's monthly reports. And Betts testified that she was aware that Stallard was using her (Betts's) false summary receipt figures to complete the County's monthly reports.

Based on this evidence, a rational trier of fact could conclude that Betts caused an innocent or irresponsible individual (Stallard) to make a false statement on a tax return and that

---

[24] Betts also argues for the first time on appeal that Stallard's monthly "reports" were not "tax returns" and, thus, did not invoke RCW 82.32.290(2)(a)(iii). Br. of Appellant at 22. Betts cites no case law supporting this argument, as RAP 10.3(a)(6) requires. Therefore, we do not further consider this argument.

Betts did so with the intent to defraud the State or to evade the payment of a tax or part thereof.[25] Accordingly, we hold that the State presented sufficient evidence to support Betts's convictions for filing a false or fraudulent tax return.

## VII. DOUBLE JEOPARDY

For the first time on appeal, Betts argues that her convictions for first degree theft and money laundering constitute double jeopardy. We disagree.

### A. Standard of Review; Statutory Construction

We review claims of double jeopardy de novo. *State v. Jackman*, 156 Wn.2d 736, 746, 132 P.3d 136 (2006). The double jeopardy clauses of the state and federal constitutions protect a defendant against multiple punishments for the same offense. U.S. CONST. amend. V; WASH. CONST. art. I, § 9; *State v. Calle*, 125 Wn.2d 769, 772, 888 P.2d 155 (1995). When analyzing a double jeopardy claim, we first look to the statutory language to determine if it expressly permits multiple punishments in the applicable statutes. *Jackman*, 156 Wn.2d at 746. If the legislature authorized cumulative punishments for both crimes, then double jeopardy is not implicated. *State v. Freeman*, 153 Wn.2d 765, 771, 108 P.3d 753 (2005).

---

[25] Betts also argues that she cannot be held liable for the false statements Stallard made in her monthly reports filed with the Department of Revenue because (1) Stallard did not intend to defraud the State; and (2) Betts was not legally accountable for Stallard's conduct because Stallard was negligent in performing her oversight functions and should have reviewed Betts's daily REET account reconciliations. Betts appears to misunderstand the nature of her culpability under the legal accountability provisions of the complicity statute. Under RCW 9A.08.020, the State needed to prove that Betts, not Stallard, had the requisite intent to defraud the State or to evade paying any tax or part thereof. Similarly, Stallard's negligence in overseeing Betts's daily work is not relevant here because such negligence would only reinforce that Stallard was an "innocent" or "irresponsible" person under RCW 9A.08.020(2)(a).

If the statutes do not expressly allow multiple punishments, then we turn to statutory construction and we apply the "same evidence" test. *Jackman*, 156 Wn.2d at 746. Under the same evidence test, if each offense contains an element not contained in the other offense, the offenses are different for purposes of double jeopardy and the multiple convictions can stand. *Jackman*, 156 Wn.2d at 747. This test requires the court to determine ""whether each provision requires proof of a fact which the other does not."" *Jackman*, 156 Wn.2d at 747 (quoting *State v. Baldwin*, 150 Wn.2d 448, 455, 78 P.3d 1005 (2003) (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932))).

As a rule of statutory construction, the same evidence test serves as a means of discerning legislative purpose; but it should not be controlling where there is a clear indication of contrary legislative intent. *Calle*, 125 Wn.2d at 778. Thus, even if the two statutes pass the same evidence test, the multiple convictions may not stand if the legislature has "'otherwise clearly indicated its intent that the same conduct or transaction will not be punished under both statutes.'" *Jackman*, 156 Wn.2d at 746 (emphasis omitted) (quoting *Baldwin*, 150 Wn.2d at 455-56).

### B. First Degree Theft and Money Laundering

We first turn to the language of the pertinent criminal statutes to determine whether the legislature expressly authorized multiple punishments for these acts. We first note that the crimes of money laundering and theft are located in different chapters of the criminal code[26] and serve different purposes, which our Supreme Court has cited to support that the legislature

---

[26] *Compare* RCW 9A.56 (theft), *with* 9A.83 (money laundering).

intended to punish two offenses separately. *See, e.g., Calle*, 125 Wn.2d at 780 (incest and child rape are located in different chapters in the criminal code and address different harms). Furthermore, the money laundering statute expressly requires additional punishment: "Proceedings under this chapter *shall* be *in addition to any other criminal penalties*, civil penalties, or forfeitures authorized under state law." RCW 9A.83.020(6) (emphasis added).[27] Accordingly, we hold that (1) the legislature intended to allow cumulative punishments for money laundering and other criminal offenses, and (2) the trial court did not violate the constitutional prohibitions against double jeopardy by entering Betts's convictions for both first degree theft and money laundering.[28]

---

[27] This provision is analogous to the burglary antimerger language in RCW 9A.52.050, which our Supreme Court has recognized as expressly authorizing cumulative punishments. *Calle*, 125 Wn.2d at 777 n.2. RCW 9A.52.050 provides:

> Every person who, in the commission of a burglary shall commit any other crime, may be punished therefor[e] as well as for the burglary, and may be prosecuted for each crime separately.

[28] The result would not be any different under the same evidence test. To commit first degree theft as charged here, a person must "wrongfully *obtain* or *exert unauthorized control* over the property or services of another [which *exceeds $5,000 in value*], with intent to deprive him or her of such property or services." RCW 9A.56.020(1)(a)(emphasis added); RCW 9A.56.030(1)(a). In contrast, RCW 9A.83.020 provides:

> (1) A person is guilty of money laundering when that person *conducts or attempts to conduct a financial transaction* involving the proceeds of specified unlawful activity and:
>> (a) Knows the property is proceeds of specified unlawful activity; or
>> (b) Knows that the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds, and acts recklessly as to whether the property is proceeds of specified unlawful activity.

(Emphasis added). A "financial transaction" means "a purchase, sale, . . . transfer, transmission, delivery, trade, *deposit, withdrawal, payment, transfer between accounts, exchange of currency,* extension of credit, or any other acquisition or disposition of property." RCW 9A.83.010(3)

## VIII. Exceptional Sentences; Lack of Remorse

Last, Betts argues that we should vacate her exceptional sentences and remand for resentencing before a different trial judge because the trial court improperly "penalized"[29] her for exercising her trial rights and considered improper reasons when imposing her exceptional sentences. Betts bases her argument on the trial court's oral comments at sentencing that she had "'not . . . cooperate[d]'" in the investigation of her case, had been given an "'enormously complicated and expensive trial,'" and lacked remorse. Br. of Appellant at 48, 49 (quoting 8 VRP at 1392).

The State responds that we should reject Betts's argument because (1) the trial court clearly stated that it imposed its exceptional sentences based on the jury's special verdict findings that Betts's first degree theft and money laundering crimes were both major economic

---

(emphasis added). A "specified unlawful activity" includes class A and B felonies, such as first degree theft. RCW 9A.83.010(7); RCW 9A.56.030(2).

The first degree theft statute includes a specific value as a fact that the State must prove in addition to proving the underlying conduct of the crime, i.e., obtaining or exerting unauthorized control over the property of another. RCW 9A.56.030(1)(a). The money laundering statute includes an additional requirement that the defendant conducted or attempted to conduct a "financial transaction" with the proceeds of the specified unlawful activity, here, first degree theft. Because these statutes each require proof of an element or fact that the other does not, first degree theft and money laundering do not constitute the same offense under the same evidence test. We hold, therefore, that Betts's two convictions for these two crimes do not constitute double jeopardy.

[29] Br. of Appellant at 48.

offenses or series of offenses under RCW 9.94A.535(3)(d)[30]; and (2) although "unfortunate," the trial court's passing comments referencing Betts's exercise of her jury trial rights were not the basis for her exceptional sentences because the trial court "specifically acknowledge[d] that it could not take those facts into consideration at sentencing." Br. of Resp't at 34.

Although we agree with the State that the trial court properly relied on the jury's two special verdicts when imposing Betts's exceptional sentences,[31] we also agree with Betts that the record shows that the trial court improperly considered her lack of "remorse" when it imposed these sentences. Because this error was not harmless beyond a reasonable doubt, we vacate Betts's exceptional sentences. We also grant Betts's request for resentencing before a new judge.

## A. Standard of Review

A court may impose an exceptional sentence above the standard range if it finds "substantial and compelling reasons" for doing so and those reasons support the purposes behind

---

[30] The Legislature has amended this statute several times since 2003, including the amendments in 2005, which required that "major economic offense" and "egregious lack of remorse" aggravating factors be submitted to a jury rather than decided by a trial court judge. Because this provision has not changed in substance since the 2005 amendments, we cite the current version of the statute.

[31] At sentencing the trial court mentioned Betts's lack of cooperation with the County's investigation and noted that her trial had been "'enormously complicated and expensive.'" Br. of Appellant at 48, 49 (quoting 8 VRP at 1392). As the State acknowledges in its brief, "These references are unfortunate, and if relied upon by the trial court would form an improper basis for the sentence." Br. of Resp't at 34. We note that, in imposing her exceptional sentences, the trial court explicitly recognized that (1) Betts had "an absolute right to remain silent" and "an absolute right to a jury trial," and (2) she "cannot be punished for exercising those rights." 8 VRP at 1391-92. Therefore, we decline to presume that these "unfortunate" comments "penalized" Betts in the manner that she asserts. Br. of Appellant at 48.

the Sentencing Reform Act. RCW 9.94A.535; *State v. Davis*, 146 Wn. App. 714, 719, 192 P.3d 29 (2008). We review exceptional sentences under a three-part test, considering: (1) whether the record supports the reasons for departure under a clearly erroneous standard, (2) whether those reasons justify the departure as a matter of law, and (3) whether the exceptional sentence was clearly too excessive or lenient under an abuse of discretion standard.[32] *State v. Allert*, 117 Wn.2d 156, 163, 815 P.2d 752 (1991).

## B. Exceptional Sentences

In its written findings of fact and conclusions of law, the trial court found that (1) the jury had returned two special verdicts finding that Betts's first degree theft and money laundering crimes each constituted "a major economic offense or [a] series of offenses" under RCW 9.94A.535(3)(d);[33] (2) "[these] aggravating circumstances separately considered and affirmatively found to exist by the jury. . . allow for the Court to impose an exceptional sentence above the standard range";[34] (3) Betts's first degree theft conviction was the highest ranked offense at sentencing; (4) it had occurred over a lengthy period of time and had involved (a) monetary losses substantially greater than the $5,000 required for the crime; (b) a high degree of sophistication; and (c) Betts's repeatedly violating her position of trust and fiduciary

---

[32] Because Betts does not argue that the trial court abused its discretion in imposing her exceptional sentence above the standard range, we do not address the third prong of the test—whether the length of the trial court's exceptional sentence was permissible. We do, however, address the first and second prongs of the test.

[33] CP at 14 (FF 3, 4).

[34] CP at 15 (FF 5).

responsibility to perpetrate the crime;[35] and (5) these factors were "substantial and compelling reasons" to depart from the standard range sentence.[36]

Betts does not dispute that her first degree theft and money laundering offenses were major economic offenses or series of offenses within the meaning of RCW 9.94A.535(3)(d). Nor does she dispute the trial court's written findings, which are verities on appeal. *Stenson*, 132 Wn.2d at 697; *State v. Schmeck*, 98 Wn. App. 647, 650-51, 990 P.2d 472 (1999). We agree that these reasons for the trial court's exceptional sentence are supported by the record and justify departure from the standard range as a matter of law. Nevertheless, this conclusion does not end our inquiry into the propriety of Betts's exceptional sentences.

When imposing Betts's exceptional sentences, the trial court orally stated that it "*must factor*" Betts's lack of "remorse" into its sentencing decision. 8 VRP at 1390 (emphasis added). But under RCW 9.94A.535(3)(q), a defendant's "egregious lack of remorse" is an aggravating factor that only a jury may determine; our legislature has not authorized the trial court to make this determination. RCW 9.94A.535(3)(q). Consistent with RCW 9.94A.535(3)(q), the United States Supreme Court has also held that the Sixth Amendment to the United States Constitution requires any fact that increases the penalty for a crime beyond the prescribed statutory maximum (other than the fact of a prior conviction) to be submitted to the jury and proved beyond a reasonable doubt. *Blakely v. Washington*, 542 U.S. 296, 301, 303-04, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). Again, here, the jury was not asked to address this "lack of remorse"

---

[35] CP at 15-16 (CL 7, 8). We review a finding of fact as such, even if erroneously labeled a conclusion of law. *State v. Ross*, 141 Wn.2d 304, 309-10, 4 P.3d 130 (2000).

aggravating factor. We hold, therefore, that the trial court violated Betts's Washington statutory and federal constitutional rights to have a jury determine lack of remorse before the trial court may impose an exceptional sentence based on this factor. RCW 9.94A.535(3)(q); *Blakely*, 542 U.S. at 303-04.

To affirm Betts's exceptional sentences, we must be convinced that the trial court would have imposed the same sentences even if it had not considered her lack of remorse. *State v. Jackson*, 150 Wn.2d 251, 276, 76 P.3d 217 (2003). We acknowledge the trial court's extensive recitation of compelling factors, including the extreme amount of money (more than half a million dollars) that Betts stole from the County while abusing the public trust for several years, which clearly supported an upward departure from a standard range sentence for Betts. But the trial court expressly stated that, if Betts had admitted guilt, shown remorse, or avoided a lengthy and expensive trial, her situation at sentencing would have been "considerably better"; thus, we are not persuaded beyond a reasonable doubt that Betts would have received the same exceptional sentences absent the trial court's statutorily unauthorized consideration of her lack of remorse. 8 VRP at 1392. Accordingly, we vacate Betts's exceptional sentences and remand for resentencing.

Finally, we consider Betts's request that we remand for resentencing before a different judge. Because we vacate the exceptional sentences based on the trial court's improper consideration of a factor that the legislature has provided only the jury can decide, we do not address another ground that Betts asserts to justify resentencing—the trial court's statements

---

[36] CP at 15 (CL 7).

41

that, if Betts had admitted guilt or avoided a lengthy and expensive trial, her situation at sentencing would have been "considerably better." 8 VRP at 1392. As the trial court itself acknowledged, Betts's objections—that these comments impinged on her having exercised her Fifth Amendment right to remain silent and her Sixth Amendment right to a jury trial—made her situation at sentencing considerably worse. These constitutional claims are likely to delay resolution of this case if we do not respond to them now. Thus, in the interests of judicial economy and in furtherance of a timely and apparently fair resolution of Betts's sentencing issues, we grant her request for resentencing before a different judge.[37]

### SANCTIONS

RAP 18.9(a) provides, in part: "The appellate court on its own initiative . . . may order . . . . counsel . . . who . . . fails to comply with these rules . . . to pay sanctions to the court." Betts's appellate counsel, Jordan McCabe, has blatantly violated our appellate rules in several significant respects, each of which warrants the imposition of sanctions under RAP 18.9(a). RAP 10.7 also provides, "The appellate court will ordinarily impose sanctions on . . . counsel for a party who files a brief that fails to comply with these rules."

---

[37] In so doing, we do not imply that the trial court, who has announced his retirement, would not be fair on resentencing. Nevertheless, we are mindful of the judicial canons's emphasis on the "appearance of fairness," as well as actual fairness. CJC 1.2 ("A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."). By remanding to a different judge for resentencing, we remove any contention about judicial impartiality from further debate.

No. 42519-0-II

## I. CITATION OF UNPUBLISHED OPINION

RAP 10.3(a)(6) requires the argument portion of an appellate brief to include "citations to legal authority." But in her brief of appellant, counsel cites unpublished portions of two appellate decisions, contrary to GR 14.1(a), which provides:

> A party may not cite as an authority an unpublished opinion of the Court of Appeals. Unpublished opinions of the Court of Appeals are those opinions not published in the Washington Appellate Reports.

*See* Br. of Appellant at 44-45, 49 (citing unpublished portions of *State v Dingman*, 149 Wn. App. 648, 202 P 3d 388 (2009), to support her double jeopardy argument; and *State v. Radcliffe*, 139 Wn. App. 214, 159 P.3d 486 (2007), to support her exceptional sentence "penalizing" argument). For each of these two violations, we impose a $50 sanction, for a total of $100.

## II. MATERIAL MISREPRESENTATIONS ON APPEAL

### A. Written

RAP 10.3(a)(6) requires the argument portion of an appellate brief to include "references to relevant parts of the record." Rule of Professional Conduct 3.3(a)(1), entitled "CANDOR TOWARD THE TRIBUNAL," provides that a lawyer shall not knowingly "make a false statement of fact or law to a tribunal." Here, appellate defense counsel, Jordan McCabe, made at least two false statements of fact in her briefing filed with our court: Counsel misrepresented the record at pages 9 and 12 of her brief of appellant, asserting that she "requested a change of venue" and that the "trial court said it would deny the motion." Br. of Appellant at 9, 12 (citing VRP at 63, 65, respectively). The record does not support these factual assertions. For these material written misrepresentations to the court, we impose a $100 sanction.

43

## B. Oral

McCabe similarly and repeatedly misrepresented to this court at the April 1, 2013 oral argument that trial counsel had moved the trial court for a change of venue and that the trial court had denied her motion. More specifically, McCabe stated that trial counsel had informed the trial court that she intended to file a motion to change venue, but that the trial court had flatly stated "don't bother" and that, "despite pretrial publicity," it (the trial court) was "convinced" it would "be able to seat an impartial jury."[38] During oral argument, our court (1) explained our understanding that, although Betts' trial counsel had mentioned a change of venue to the trial court, trial counsel had never followed through with a written or oral motion; and (2) asked counsel where in the record it showed that she had actually moved for a change of venue below. McCabe again replied that the trial court had stated that trial counsel need not file a motion to change venue because it would be a "futile act." Oral Argument, *supra*, at 2 min., 30 sec. Our court repeatedly challenged McCabe at oral argument to support these assertions with citation to the record. Although McCabe continued to make these assertions, she pointed to no support in the record. Nor could she because the record shows that the trial court never said what counsel represented it had said.

The record shows that Betts never moved for a change of venue below and that the trial court never denied such a motion. Instead, the record shows that when the State mentioned that Betts might seek a change of venue, the trial court asked Betts's counsel whether she intended to

---

[38] Wash. Court of Appeals oral argument, *State v. Betts*, No. 42519-0-II (April 1, 2013), at 1 min., 57 sec.—2 min., 14 sec. (on file with court).

file a motion for change of venue based on pretrial publicity; and counsel replied, "Yes, your honor." 1 VRP at 61. After explaining that it normally waited to see whether it could impanel an impartial jury before deciding such motions, the trial court told Betts to "go ahead and file" her motion and that it (the court) would address the motion before trial; counsel responded, "We will." 1 VRP at 65. But nowhere does the record show that counsel ever filed a motion to change venue in the trial court or raised the venue issue again, not pretrial or even during or after jury selection.

Nevertheless, at oral argument before us on appeal, defense counsel persisted in asserting that Betts had moved to change venue below and that the trial court had said the filing of a motion to change venue would be futile. Even when the panel explained its contrary understanding of the record and gave counsel an opportunity to check the record and to correct her assertions, she persisted in attempting to mislead the court. Giving counsel the benefit of the doubt, we do not believe that these misrepresentations were intentional. Nevertheless, even if we assume that these misrepresentations were the result of carelessness, they were inexcusable, especially in light of the panel's expressed incredulity about counsel's claims and her refusal or inability to check their accuracy. For these repeated blatant oral misrepresentations to the court, we impose sanctions of $150.

No. 42519-0-II

We affirm Betts's convictions, vacate her exceptional sentences, and remand for resentencing by a different judge. We also impose $350 in total sanctions against her appellate counsel, Jordan B. McCabe, payable to the registry of this court.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Hunt, J.

We concur:

_____
Johanson, A.C.J.

_____
Quinn-Brintnall, J.

46